# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SALMIERI GRAND JERSEY LLC, and FIELDS GRAND AVE JC LLC, individually and derivatively on behalf of GRAND JERSEY GROUP, LLC, SALMIERI SIP AVENUE LLC, and SIP AVENUE JC HOLDINGS LLC, | : : : : : | Civ. No. |
| Plaintiffs, | : | **VERIFIED COMPLAINT** |
| v. | : | |
| GEORGE FIGLIOLIA, LOUIS FIGLIOLIA, JR., VINCENT GARCIA, G BUILDERS LLC, GB DEVELOPMENT III LLC, GB DEVELOPMENT V LLC, BG DEVELOPMENT LLC, DNG GROUP LLC, DNG GROUP I LLC, FIDUCIARY TRUST INTERNATIONAL OF DELAWARE AS TRUSTEE OF THE FIGLIOLIA FAMILY DYNASTY TRUST, JOSE ORTIZ, FORTHRIGHT HOLDINGS LLC, FORTHRIGHT HOLDINGS V LLC, FORTHRIGHT HOLDINGS VIII LLC, TZZ INVESTMENT GROUP, LLC, DISCERNMENT LLC, CRESCENTBROOK GLOBAL LLC, BIRCHCREST ADVISORS, LLC, MARCUS ASANTE, and JOHN DOES 1 – 100, | : : : : : : : : : : : : | Jury Trial Requested |
| Defendants. | : | |

Plaintiffs Salmieri Grand Jersey LLC and Fields Grand Ave JC LLC, in their individual capacity and derivatively as Members of Grand Jersey Group, LLC, Salmieri Sip Avenue LLC, and Sip Avenue JC Holdings LLC (collectively, "Plaintiffs"), by their attorneys, by way of this Verified Complaint against defendants George Figliolia, Louis Figliolia, Jr., Vincent Garcia, G Builders LLC, GB Development III, LLC, GB Development V, LLC, BG Development LLC, DNG Group LLC, DNG Group I LLC, Fiduciary Trust International of Delaware as Trustee of the Figliolia Family Dynasty Trust, Jose Ortiz, Forthright Holdings LLC, Forthright Holdings V, LLC, Forthright Holdings VIII, LLC, TZZ Investment Group, LLC, Discernment LLC, Crescentbrook Global LLC, Birchcrest Advisors LLC, Marcus Asante, and John Does 1 – 100 (collectively, "Defendants"), say:

## I.    NATURE OF THE ACTION

1.    This action stems from defendants George Figliolia, Louis Figliolia, Jr., and Jose Ortiz's scheme to fraudulently obtain millions of dollars from plaintiffs. Through lies and deceit—including the use of doctored, fabricated, and otherwise false documents—these defendants conned the plaintiffs to invest their money in two real estate ventures, all so that they could embezzle the funds for themselves.

2.    Plaintiffs Salmieri Grand Jersey LLC and Fields Grand Ave JC LLC (the "Grand Jersey Plaintiffs") are members of a limited liability company—Grand Jersey Group, LLC ("Grand Jersey"). Grand Jersey was created to purchase and redevelop a property on Monmouth Street in Jersey City from the Jersey City Redevelopment Agency ("JCRA"). Together, the Grand Jersey Plaintiffs invested more than $2.8 million in Grand Jersey.

3.     Plaintiffs' supposed partner in Grand Jersey is defendant George Figliolia. An entity that George Figliolia controls is the majority member of Grand Jersey, and Louis Figliolia, Jr., George Figliolia's nephew, is Grand Jersey's manager. Together, George Figliolia and Louis Figliolia, Jr. (collectively, the "Figliolias") were to oversee the construction and redevelopment of the Grand Jersey property. As the majority member and manager, the Figliolias control Grand Jersey's finances and vendor agreements.

4.     A similar arrangement was planned for a separate, but similar real estate transaction involving a property on Sip Avenue in Jersey City ("Sip Avenue"). Plaintiffs Salmieri Sip Avenue LLC and Sip Avenue JC Holdings LLC (the "Sip Avenue Plaintiffs") invested approximately $1 million in the Sip Avenue project. As with Grand Jersey, the Figliolias were supposed to be their partner, serving as the majority member and manager and overseeing the construction and finances.

5.     For both deals, George Figliolia (through his companies) agreed to invest the same amount of money as plaintiffs. And because the Figliolias were overseeing the finances, it was one of their associates who regularly notified the partners to contribute their money throughout 2023 and 2024.

6.     Defendant Jose Ortiz ("Ortiz"), a close associate of the Figliolias, was to provide the financing for both transactions, and would have received an ownership percentage of both ventures had the deals ever closed.

7.     Plaintiffs have discovered that the Figliolias, Ortiz, and their associates were perpetrating a fraud from the very beginning, all for the purpose of stealing

plaintiffs' investments. George Figliolia never contributed his money to either venture, despite his associate regularly sending documents falsely reflecting that he had. Ortiz used a doctored bank letter and a bogus financing agreement to give the false appearance that he could finance the transactions. But Ortiz was lying all along. He never had sufficient funds in his control, and never obtained financing. The Figliolias knew that Ortiz was defrauding the plaintiffs in executing his part of the scheme.

8.    Through their fraud, the Figliolias, Ortiz, and their associates wrongfully took plaintiffs' money. The Figliolias paid themselves and their entities with hundreds of thousands of dollars of plaintiffs' money, and they continue to send invoices demanding millions more. They also paid Ortiz several hundred thousand dollars. Although they paid themselves, the Figliolias apparently failed to pay numerous vendors, potentially running up hundreds of thousands of dollars in invoices addressed to Grand Jersey and Sip Avenue. And because Ortiz never delivered financing, the Grand Jersey transaction failed to close and the JCRA terminated its agreements, causing significant damages to the Grand Jersey Plaintiffs.

9.    As their fraud began to unravel, the Figliolias used their control of Grand Jersey to lock plaintiffs out of the company and cover up their own and Ortiz's fraudulent conduct. They have refused to share Grand Jersey's books and records or provide an accounting. They have made and continue to make unauthorized representations and false and threatening statements to plaintiffs and the JCRA.

They have caused the filing of unlawful liens on JCRA property, and threatened others. They have refused to take votes on company actions and acted against the Grand Jersey Plaintiffs' express instructions. They have also covered for Ortiz's fraud, and failed to demand that Ortiz return all of the funds he obtained from these projects. Remarkably, the Figliolias continue to try to extract more money for themselves, submitting millions of dollars of invoices to plaintiffs as recently as January 30, 2025 for work purportedly done by George Figliolia's companies. These invoices are fraudulent too, because all work on both projects was ordered to be stopped months ago.

10.    The Figliolias have violated their fiduciary duties by committing fraud, freezing the Grand Jersey Plaintiffs out of the company, oppressing their rights as shareholders, and acting contrary to Grand Jersey's interests, among other things. Through this action, the Grand Jersey Plaintiffs seek to remove the Figliolias from the company entirely, to assess the scope of the financial harm caused by the Figliolias, Ortiz, and their associates, and to take whatever actions remain for Grand Jersey to recoup plaintiffs' investments, if possible, including selling the company.

11.    Plaintiffs also seek financial recourse against the Figliolias, Ortiz, and their associates. Plaintiffs were fraudulently induced to invest nearly $4 million by the Figliolias, Ortiz, and their associates. Moreover, the Figliolias, Ortiz, and their associates caused the termination of the Grand Jersey deal with the JCRA, causing plaintiffs significant economic and reputational damages.

## II.    PARTIES

### A.    Plaintiffs

12.    Plaintiff Salmieri Grand Jersey LLC ("Salmieri Grand Jersey") is a limited liability company formed under the laws of New Jersey with a principal place of business at 28 Sunset Drive, Tinton Falls, New Jersey 07724.

13.    Plaintiff Fields Grand Ave JC LLC ("Fields Grand Ave") is a limited liability company formed under the laws of New Jersey with a principal place of business at 500 Avenue P, Newark, New Jersey 07105.

14.    Derivative plaintiff Grand Jersey is a limited liability company formed under the laws of New Jersey with a principal place of business at 235 Watchung Avenue, West Orange, New Jersey 07052. At the time of formation, the members of Grand Jersey Group included Salmieri Grand Jersey and GB Development III LLC. Fields Grand Ave and other members joined Grand Jersey Group later. Salmieri Grand Jersey and Fields Grand Ave continue to be members of Grand Jersey.

15.    185 Monmouth Street LLC ("185 Monmouth") is a limited liability company incorporated under the laws of Delaware with a principal place of business located at 235 Watchung Avenue, West Orange, New Jersey 07052. Upon information and belief, 185 Monmouth is a wholly owned subsidiary of Grand Jersey.

16.    Plaintiff Salmieri Sip Avenue LLC ("Salmieri Sip Avenue") is a limited liability company formed under the laws of New Jersey with a principal place of business at 28 Sunset Drive, Tinton Falls, New Jersey 07724.

17.     Plaintiff Sip Avenue JC Holdings LLC ("Sip Avenue JC Holdings") is a limited liability company formed under the laws of New Jersey with a principal place of business at 500 Avenue P, Newark, New Jersey 07105.

18.     Salvatore Salmieri, Sr. is an individual representative of Salmieri Grand Jersey and Salmieri Sip Avenue.

19.     Scott Fields is an individual representative of Fields Grand Ave and Sip Avenue JC Holdings.

**B.     Defendants**

*1.     The Figliolias, Their Entities, and Affiliated Parties*

20.     Defendant G Builders LLC ("G Builders") is a limited liability company authorized under the laws of New York with a principal place of business at 45 Broadway, 4th Floor, New York, New York 10006.

21.     Defendant BG Development LLC ("BGD") is a limited liability company authorized under the laws of New York with a principal place of business at 45 Broadway, 4th Floor, New York, New York 10006.

22.     Defendant GB Development III LLC ("GBD3") is a limited liability company authorized under the laws of New York with a principal place of business at 45 Broadway, 4th Floor, New York, New York 10006. Upon information and belief, GBD3 is owned by the Figliolia Family Dynasty Trust, whose beneficiaries are George Figliolia and his descendants.

23.     Defendant GB Development V LLC ("GBD5") is a limited liability company authorized under the laws of New York with a principal place of business at 45 Broadway, 4th Floor, New York, New York 10006. Upon information and belief,

GBD5 is owned by the Figliolia Family Dynasty Trust, whose beneficiaries are George Figliolia and his descendants.

24.    Defendant DNG Group LLC ("DNG"), upon information and belief, is a limited liability company incorporated under the laws of Texas with a principal place of business at 45 Broadway, 4th Floor, New York, New York 10006. DNG is also registered in New Jersey. According to the New Jersey Certificate of Registration, Ronald Figliolia is the registered agent and Steven Figliolia is the general partner.

25.    Defendant DNG Group I LLC ("DNG1") is a limited liability company authorized under the laws of New York with a principal place of business at 45 Broadway, 4th Floor, New York, New York 10006. DNG1 is also registered in New Jersey. According to the New Jersey Certificate of Registration, Ronald Figliolia is the registered agent and George Figliolia is the general partner.

26.    Defendant Fiduciary Trust International of Delaware as Trustee of the Figliolia Family Dynasty Trust ("Figliolia Trust"), upon information and belief, was created to benefit George Figliolia and his descendants. Upon information and belief, the Figliolia Trust owns all or part of G Builders, BGD, GBD3, GBD5, DNG, and DNG1. Upon information and belief, Fiduciary Trust International of Delaware is located at 4250 Lancaster Pike, Suite 210, Wilmington, Delaware 19805.

27.    Defendant George Figliolia is the *de facto* principal of G Builders, BGD, GBD3, GBD5, DNG, DNG1 (together, the "Figliolia Companies"), and, upon information and belief, is a beneficiary of the Figliolia Family Dynasty Trust. Upon

information and belief, George Figliolia has a property located at 112 Georgica Close Road, East Hampton, New York 11937.

28.     Defendant Louis Figliolia, Jr. is George Figliolia's nephew, and upon information and belief, is an employee of G Builders, BGD, GBD3, GBD5, DNG, and DNG1. Upon information and belief, Louis Figliolia, Jr. serves as the face of George Figliolia's companies when George Figliolia is unable to be the outward facing manager because of his prior criminal conviction. Upon information and belief, Louis Figliolia, Jr.'s office is located at 45 Broadway, 4th Floor, New York, New York 10006.

29.     Defendant Vincent Garcia ("Garcia"), upon information and belief, is related to George Figliolia and is an employee of G Builders, BGD, GBD3, GBD5, DNG, and DNG1. Upon information and belief, Garcia resides at 40 Athens Way, Cliffwood, New Jersey 07721.

### a.     *George Figliolia's Criminal Conviction*

30.     George Figliolia and others, including the Builders Group, a company George Figliolia was sole shareholder and president of, were indicted in 2010 by the New York County District Attorney's Office for grand larceny, scheme to defraud, and other offenses. *See People v. Builders Group, George Figliolia, Isaac Stareshefsky, and John Krupa*, Indictment No. 00033/2010. The indictment alleged that defendants "during the period from on or about September 1, 2006 to on or about December 31, 2008, stole property and the value of the property exceeded one million dollars" and "during the period from on or about January 1, 2006 to on or about 2009, *engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person and to obtain property from more than one person by false and*

9

*fraudulent pretenses, representations and promises, and so obtained property with a value in excess of one thousand dollars from one or more such persons.*" (emphasis added). In or about April 2011, both George Figliolia and Builders Group pled guilty in connection with these charges.

### 2.    *Ortiz, His Entities, and Affiliated Parties*

31.    Defendant Jose Ortiz holds himself out as being in the business of securing financing for real estate and other transactions. Ortiz operates using various entity names, which are effectively his alter egos. Ortiz resides at 17 Hillandale Manor, Norwalk, Connecticut 06851 and uses his home address as the business address for many of his various entities. Ortiz also uses George Figliolia's office at 45 Broadway, 4th Floor, New York, New York 10006, as a business address for his various companies.

32.    Upon information and belief, although Ortiz has created numerous limited liability companies for his various business endeavors, he fails to keep his companies separate. Upon information and belief, he regularly commingles email accounts and funds between his various companies and his personal accounts, including paying his credit cards from company funds.

33.    Defendant Forthright Holdings LLC ("Forthright") is a limited liability company organized under the laws of Florida with a principal place of business at 255 S. Orange Avenue Suite 104 #1498, Orlando, Florida 32801, according to records from the Florida Division of Corporations. According to court records from a separate litigation, Forthright is also registered under the laws of Delaware, is operated from

Ortiz's home in Norwalk, Connecticut, and maintains an office at 45 Broadway, New York, New York, which is George Figliolia's office address.

34.     Defendant Forthright Holdings V LLC ("Forthright V") is a Delaware limited liability company, whose registered agent is Delaware Corporate Agents, Inc., 3500 S. Dupont Highway, Dover, Delaware 19901.

35.     Defendant Forthright Holdings VIII LLC ("Forthright VIII") upon information and belief, has yet to be registered in any state.

36.     Ortiz is the principal and sole owner of Forthright, Forthright V, and Forthright VIII (collectively, the "Forthright Entities"). Upon information and belief, Ortiz has described Forthright as an extension of himself. Upon information and belief, he uses the term "Forthright" interchangeably for all the Forthright Entities.

37.     Defendant Discernment LLC ("Discernment") is a limited liability company organized under the laws of Delaware. Upon information and belief, Ortiz has also described Discernment as an extension of himself and used an email affiliated with this entity to conduct dealings related to Grand Jersey and Sip Avenue. Discernment has a registered agent for service of process at United States Corporation Agents Inc., 131 Continental Drive Suite 305, Newark, Delaware 19713.

38.     Ortiz also controls defendant Crescentbrook Global LLC ("Crescentbrook Global") and used an email affiliated with this entity to conduct dealings related to Grand Jersey. Crescentbrook Global is a limited liability company that is organized under the laws of Delaware. Crescentbrook Global has a registered agent for service of process at Harvard Business Services, Inc., 16192 Coastal

11

Highway, Lewes, Delaware 19958. According to Crescentbrook Global's website (https://crescentbrookglobal.com), its address is 45 Broadway, 4th Floor, New York, New York 10006, the same offices as the Figliolia Companies.

39.     Defendant TZZ Investment Group, LLC ("TZZ Investment Group") is a limited liability company organized under the laws of Florida with a principal place of business at 6272 Red Canyon Dr., Unit H, Highlands Ranch, Colorado 80130. Thiago Franzese of Orlando, Florida is the manager of TZZ Investment Group, according to records from the Florida Division of Corporations. The Forthright Entities, Discernment, Crescentbrook Global, and TZZ Investment Group are referred to as the "Ortiz Entities."

40.     Defendant Birchcrest Advisors, LLC ("Birchcrest Advisors") is a limited liability company organized under the laws of Delaware with a principal place of business at 15 Walnut Ave, Trumbull, Connecticut 06611. Upon information and belief, Marcus Asante controls Birchcrest Advisors.

41.     Defendant Marcus Asante is an associate of Ortiz and resides at 15 Walnut Street, Trumbull, Connecticut 06611.

42.     Upon information and belief, John Does 1-100 conspired with Defendants.

### a.     *The $6.8 Million Judgment Against Ortiz and His Alter Egos*

43.     Ortiz, Forthright, and Discernment are the subjects of a $6.8 million judgment in the State of New York. According to court filings, on or about December 31, 2018, LFH Food Hall Operating, LLC entered a commercial lease with Summit

12

Glory Property LLC ("Summit Glory Property") for the purpose of operating a food hall in New York. Simultaneously with the execution of the lease, Ortiz entered into a Guarantee Agreement whereby he, through one of his alter ego companies, Discernment, would act as guarantor for the tenant, according to court filings. George Figliolia and one of his companies, G Builders, was to act as the construction manager. According to the plaintiff's allegations, rent was not paid, in violation of the contract, and Summit Glory Property brought an action to recover the unpaid rent. *See Summit Glory Property LLC v. Discernment LLC*, case no. 656420/2021, Complaint, Nov. 10, 2021 (N.Y. Sup. Ct.). Summit Glory Property secured a $6.8 million judgment against Discernment, which failed to pay the judgment.

44.    To enforce the judgment, Summit Glory Property sought an order to garnish Discernment's corporate bank account at TD Bank. As part of its claims, Summit Glory Property alleged that Ortiz used an altered TD Bank statement to prove his assets. Specifically, Ortiz allegedly altered the document to show that Discernment had $2,000,488.58 in a TD Bank account, when it had only $488.58— exactly $2 million less. *See Summit Glory Property LLC v. T.D. Bank*, Index No. 656420/2021, Doc. No. 3 (Oct. 17, 2023). Ortiz declined to answer questions about the allegedly altered document when questioned at a deposition.

45.    On April 11, 2024, the New York state court granted the motion to garnish Discernment's bank account and ordered that Ortiz and Forthright's accounts at TD Bank be included as well. In concluding that piercing the corporate veil between Ortiz and his two entities was proper, the court noted that there "seems

to be no distinction between Discernment, Forthright, and Ortiz" and that "ample evidence exists to support that Forthright and Discernment are one and the same and that Ortiz created Forthright to avoid Discernment's debt to plaintiff." *See Summit Glory Property LLC v. T.D. Bank*, Index No. 656420/2021, Doc. No. 70 (Apr. 8, 2024).

## III.   JURISDICTION AND VENUE

46.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

47.    This Court has supplemental jurisdiction over the claims because the plaintiffs' state law claims are interrelated with plaintiffs' federal claim and arise from a common nucleus of operative facts such that the adjudication of plaintiffs' state law claims together with plaintiffs' federal claim furthers the interest of judicial economy.

48.    Additionally, this Court has personal jurisdiction over Defendants because the Grand Jersey Plaintiffs and GBD3 agreed in Grand Jersey's Operating Agreement that any suit involving disputes or matters arising under that agreement may be brought in certain courts, including the United States District Court for the District of New Jersey. Furthermore, Defendants are doing business in New Jersey and the fraudulent conduct was directed at plaintiffs in New Jersey.

49.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because the registered office of Grand Jersey is located at 235 Watchung Avenue, West Orange, New Jersey 07052, Defendants are conducting business in New Jersey, and a substantial part of the events giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b)(2).

## IV.    FACTS COMMON TO ALL COUNTS

### A.    Grand Jersey's Formation, Membership, and Management

50.    Grand Jersey was established to develop, finance, and construct a mixed-use project on a property located at or near 185 Monmouth Street in Jersey City, New Jersey. Grand Jersey sought to purchase the property from the JCRA and be designated by the JCRA as the property's redeveloper.

51.    On or about March 30, 2023, Grand Jersey was officially formed by filing a Certificate of Formation with the State of New Jersey, Department of Treasury, Division of Revenue and Enterprise Services. Grand Jersey was organized pursuant to the New Jersey Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1 to -94. A true and accurate copy of the Certificate of Formation is attached as Exhibit A.

52.    On or about May 29, 2023, Salmieri Grand Jersey and GBD3 entered into an operating agreement for Grand Jersey. That agreement was subsequently modified as additional members joined the LLC, including Fields Grand Ave.

53.    On or about March 30, 2024, the members of Grand Jersey adopted the Second Amended and Restated Operating Agreement (the "Grand Jersey Operating Agreement"). A true and accurate copy of the Grand Jersey Operating Agreement is attached as Exhibit B.

54.    Under the Grand Jersey Operating Agreement, Grand Jersey included five members with the following ownership percentages: Salmieri Grand Jersey (19%), GBD3 (49%), Fields Grand Ave (19%), Gethsemane Holdings LLC (8%), and Fitz Holdings, LLC (5%). Upon information and belief, the Grand Jersey Operating

15

Agreement was going to be amended later to add Ortiz as a 30% owner, taking his percentage from GBD3 and leaving GBD3 with the same 19% ownership as Salmieri Grand Jersey and Fields Grand Ave. The two minority ownership interests had no role in the day-to-day Grand Jersey operations.

55.    The officers and directors of Grand Jersey include Louis Figliolia, Jr., George Figliolia, Salvatore Salmieri, and Scott Fields. A true and accurate copy of the original application that Grand Jersey submitted to the JCRA, dated April 21, 2023, is attached as Exhibit C. The original officers and directors included Louis Figliolia, Jr., George Figliolia, and Salvatore Salmieri. Scott Fields was later added as an officer and director. A true and accurate copy of an amended application that Grand Jersey sent to the JCRA on January 12, 2024, is attached as Exhibit D.

56.    Louis Figliolia, Jr. was named Grand Jersey's manager by resolution dated January 25, 2024. Under the Grand Jersey Operating Agreement, the manager was to carry on Grand Jersey's day-to-day affairs to achieve the LLC's purpose. The manager was empowered to act during the ordinary course of business, and was required to maintain complete and accurate books and records and supporting documentation related to all Grand Jersey transactions. Notably, the Grand Jersey Operating Agreement provides that Salmieri Grand Jersey and Fields Grand Ave must approve Grand Jersey actions for those situations requiring majority approval by the members. A true and accurate copy of the resolution is attached as Exhibit E.

57.    Because of his criminal conviction, George Figliolia could not serve as Grand Jersey's manager, a condition required by the JCRA, upon information and

belief. Nevertheless, upon information and belief, George Figliolia controlled and directed the company, including directing payments and signing checks, all with Louis Figliolia, Jr.'s knowledge and acquiescence. Upon information and belief, the Figliolias frequently acted interchangeably as Grand Jersey's manager.

58.    As recently as on or about September 4, 2024, the Grand Jersey Plaintiffs asked to alter the management structure such that they would be appointed as co-managers with Louis Figliolia, Jr. George Figliolia rejected this request.

**B.    The Planned Sip Avenue Transaction**

59.    Separate from the Grand Jersey transaction, the Sip Avenue Plaintiffs and George Figliolia planned to develop, finance, and construct a mixed-use project on a property located at or near 168 Sip Avenue in Jersey City, New Jersey. Like Grand Jersey, the plan was to purchase the property from the JCRA and have an LLC designated by the JCRA as the property's redeveloper.

60.    On or about May 2, 2023, Sip Avenue JV LLC was formed by filing a Certificate of Formation with the State of New Jersey, Department of Treasury, Division of Revenue and Enterprise Services. A true and accurate copy of the Sip Avenue Certificate of Formation is attached as Exhibit F.

61.    An operating agreement for Sip Avenue JV LLC was drafted, but never finalized. The Sip Avenue Plaintiffs contributed money for Sip Avenue, but never executed an agreement to become members of the LLC.

**C.**    **The Figliolias Fraudulently Obtained Millions of Dollars from Plaintiffs**

62.    Pursuant to the Grand Jersey Operating Agreement, the Grand Jersey Plaintiffs and George Figliolia agreed to contribute capital equally. The Sip Avenue Plaintiffs and George Figliolia had the same arrangement to invest money in Sip Avenue.

63.    Beginning in or about November 2023, Garcia began sending regular emails requesting capital contributions for Grand Jersey.

64.    Upon information and belief, Garcia sent subsequent emails requesting capital contributions from the Grand Jersey members in or about January, February, March, April, May, June, and July 2024. In response to those capital calls, the Grand Jersey Plaintiffs dutifully made their capital contributions. With respect to Grand Jersey, Salmieri Grand Jersey and Fields Grand Ave each contributed approximately $1,428,922.84.

65.    For Sip Avenue, Salmieri Sip Avenue contributed approximately $418.071.47 and Sip Avenue JC Holdings contributed approximately $516,295.97.

66.    The Figliolias and their associates, including Garcia, repeatedly and falsely indicated that George Figliolia had made his required capital contributions for Grand Jersey and Sip Avenue, matching those of the Grand Jersey Plaintiffs and Sip Avenue Plaintiffs.

67.    Specifically, on or about January 29, 2024, Garcia sent an email requesting additional capital for Grand Jersey. Included with Garcia's email was a spreadsheet that reflected that George Figliolia, Salmieri Grand Jersey, and Fields

18

Grand Ave had each contributed $333,333.33 in deposits. This spreadsheet gave the false impression that George Figliolia had contributed as much capital as the Grand Jersey Plaintiffs.

68.    Similarly misleading spreadsheets followed. In April 2024, Garcia sent a spreadsheet that falsely reflected that George Figliolia, Salmieri Grand Jersey, and Fields Grand Ave had each contributed $616,666.66 in addition to their deposits. In May, the reported amount was $758,333.33. In June, it was $1,000,000. In July, the spreadsheet was again updated to show that these three members had contributed $1,172,639.50.

69.    Upon information and belief, George Figliolia failed to make these contributions, even though Garcia, George Figliolia's employee and relative, sent monthly spreadsheets reflecting otherwise. The Grand Jersey Plaintiffs relied on these spreadsheets in making their own contributions to Grand Jersey. Had the Grand Jersey Plaintiffs known that George Figliolia was not making his contributions, they would not have invested more money, authorized any company expenditures, or continued to deal with the Figliolias.

70.    George Figliolia similarly failed to contribute capital to Sip Avenue, despite the Sip Avenue Plaintiffs contributing nearly $1 million. As was the case with Grand Jersey, the Sip Avenue Plaintiffs and George Figliolia were supposed to make equal contributions.

71.    On or about March 29, 2024, Garcia, at the Figliolias' direction, started making requests for capital for Sip Avenue from the Sip Avenue Plaintiffs and George

Figliolia. On or about April 12, 2024, Garcia sent an email that attached a spreadsheet showing the contributions to Sip Avenue from the entities represented by George Figliolia and the Sip Avenue Plaintiffs. Just like the spreadsheets for Grand Jersey, the spreadsheet showed that George Figliolia and the Sip Avenue Plaintiffs had all made similar contributions. This was not true, upon information and belief.

72.     Garcia sent additional requests for capital in or about July and August 2024 that were accompanied by updated versions of the same spreadsheet. The spreadsheet continued to falsely reflect that George Figliolia had contributed his money to Sip Avenue. He had not, upon information and belief.

73.     Upon information and belief, the Figliolias and Garcia had access to and knowledge of the bank accounts for Grand Jersey and Sip Avenue, and knew that George Figliolia had never made his required contributions to either LLC. Upon information and belief, the Figliolias and Garcia also knew that the spreadsheets Garcia sent to the Grand Jersey Plaintiffs and the Sip Avenue Plaintiffs gave the false appearance that George Figliolia had put his money in. Upon information and belief, this was all for the purpose of obtaining control of the plaintiffs' investments so the Defendants could scheme to embezzle those monies.

74.     The Sip Avenue Plaintiffs relied on the Figliolias' and Garcia's representations when they invested their money in Sip Avenue. In total, Salmieri Sip Avenue and Sip Avenue JC Holdings invested approximately $934,367.44 in Sip

Avenue. George Figliolia and his associates had control of the Sip Avenue bank accounts and, consequently, had possession of the contributed funds.

75.    Louis Figliolia, Jr., as the manager of Grand Jersey, breached his duty to the company by failing to tell the Grand Jersey Plaintiffs that George Figliolia had not made his contributions. Section 3.2.3 of the Grand Jersey Operating Agreement provides that if an interest holder has failed to contribute their capital contributions, the Manager shall request that the other interest holders pay that share. That never happened.

76.    The Grand Jersey Operating Agreement further provides that if the other interest holders make up the contributions, the interest holder who failed to contribute will have their ownership stake reduced. Because the Figliolias never told the Grand Jersey Plaintiffs that George Figliolia had failed to contribute his money, the Grand Jersey Plaintiffs were deprived of the opportunity to increase their ownership percentage, which consequently allowed George Figliolia to remain the majority interest holder.

77.    The Figliolias controlled the finances of Grand Jersey and Sip Avenue, including the accounting records and bank accounts. The Figliolias used their control of the finances to conceal their fraud from plaintiffs.

78.    After numerous requests for access to these financial records, in or about October and November 2024, Garcia provided plaintiffs with limited and incomplete financial information for Grand Jersey and Sip Avenue. That limited information reflected that George Figliolia had failed to make his required capital contributions

21

to Grand Jersey and Sip Avenue. Specifically, the information showed that George Figliolia had contributed approximately $20,000 to Grand Jersey and nothing to Sip Avenue.

79.    After the Grand Jersey transaction began to unravel, the Grand Jersey Plaintiffs confronted George Figliolia about failing to contribute money to Grand Jersey and Sip Avenue. On or about November 4, 2024, in response to the Grand Jersey Plaintiffs' demand that he explain why he had not made his contributions, George Figliolia wrote to the Grand Jersey Plaintiffs that "I hereby commit to personally guarantee any shortfalls in my funds to date," acknowledging that he had not contributed the required capital.

80.    Subsequently, George Figliolia attempted to backtrack from this admission. On or about December 27, 2024, George Figliolia falsely claimed to have "contributed more than our share."

### D.    The Figliolias Embezzled Plaintiffs' Investments

81.    The first part of the Figliolias' scheme was to fraudulently induce plaintiffs to contribute money to the Grand Jersey and Sip Avenue ventures by representing falsely that they had made matching contributions (as they were required to do pursuant to the arrangements with plaintiffs). The second part of the scheme was to embezzle those monies by submitting bogus and inflated invoices to Grand Jersey and Sip Avenue for work purportedly done by the Figliolia Companies. The Figliolias' control of the finances of Grand Jersey and Sip Avenue allowed them to effectuate their fraud and embezzlement scheme. Upon information and belief, George Figliolia's Associates, including Garcia, helped him embezzle the funds.

82.     Plaintiffs have limited financial information for Grand Jersey and Sip Avenue, only some of which was provided by the Figliolias and Garcia. What records they do have reflect that the Figliolias used plaintiffs' investments to pay themselves and their companies. Records for Grand Jersey reflect payments to DNG1 totaling approximately $502,850.10 and payments to GBD3 totaling approximately $325,435. The Grand Jersey Plaintiffs either have no records supporting these payments, or have records that provide insufficient detail about the purported work done to justify the payments.

83.     From the limited Grand Jersey bank account records available to plaintiffs, there were transfers of hundreds of thousands of dollars from Grand Jersey accounts to unspecified other accounts. On or about October 26, 2024, Garcia acknowledged that at least some of these transfers were "Payments to GB," referring to G Builders, one of the Figliolia Companies.

84.     For Sip Avenue, there are numerous records of "transfers" from the Sip Avenue accounts, but there is no information as to where that money went. The supporting documentation for these payments has not been provided to plaintiffs, or provides insufficient detail to describe what services were allegedly rendered.

85.     To date, the Figliolias and Garcia, despite claims of cooperation, have steadfastly refused to provide a complete accounting of the books and records of Grand Jersey and Sip Avenue, as required by the Grand Jersey Operating Agreement and their fiduciary duties.

**E.  Ortiz Fraudulently Induced Grand Jersey to Engage Him to Provide Financing**

86.    The Figliolias introduced Ortiz to the plaintiffs as someone who could provide the financing for the Grand Jersey and Sip Avenue transactions.

87.    Preliminary talks with the JCRA about the Grand Jersey and Sip Avenue real estate transactions began in or about late 2022 and January 2023. Before commencing negotiations for a purchase and sale agreement regarding the relevant properties and designating Grand Jersey or Sip Avenue as the redevelopers, the JCRA required the parties to demonstrate that they could finance the project.

88.    On or about February 10, 2023, Ortiz, on the letterhead of TZZ Investment Group, caused the submission of a letter to the JCRA's Executive Director regarding Grand Jersey and Sip Avenue (the "Ortiz Letter"). According to an audit report of the document, the document was created by one of George Figliolia's employees, Diana Cabranes of G Builders, on February 10, 2023, emailed to Ortiz the same day, and then electronically signed by Ortiz approximately 22 minutes after viewing the document. A true and accurate copy of the Ortiz Letter, dated February 10, 2023, and its attachments are included as Exhibits G1 and G2.

89.    Before sending the letter to the JCRA, Cabranes told Grand Jersey's counsel that "George [Figliolia] feels it would be best if [counsel for Grand Jersey] emails [the Ortiz Letter] instead of us. Attached are the documents to be sent. Please have [counsel for Grand Jersey] discuss with George if he thinks otherwise." Grand Jersey's counsel ultimately transmitted the Ortiz Letter to the JCRA.

90.    In the letter, Ortiz claimed a successful working relationship with BGD—meaning George Figliolia—"over the past several years." Ortiz wrote that he had "been in regular discussions with BG Development LLC on these projects [*i.e.,* Grand Jersey and Sip Avenue] and are committed to their funding upon the successful completion of a Purchase Sale Agreement." Ortiz further claimed that "TZZ Investment Group, LLC has sufficient capital committed to the consideration of these projects . . . ."

91.    Attached to the Ortiz Letter was what purported to be a January 27, 2023 memorandum from U.S. Bank Institutional Trust and Custody (U.S. Bank) in Denver, Colorado addressed to TZZ Investment Group. The memorandum reflected a balance of over $56 million for TZZ Investment Group's account as of January 23, 2023. The memorandum also stated that "Jose Ortiz is the sole signatory on the account and has the authority to sign on the account. Jose has the authority to liquidate the account." The relevant portion of the memorandum that Ortiz submitted to the JCRA is below:

> 1.  Jose Ortiz is the sole signatory on the account and has the authority to sign on the account.
>      Jose has the authority to liquidate the account.
> 2.  The account is fully available to be pledged for collateral as it does not have any pledge at US bank.
> 3.  Please see below for balance information:

92.    The memorandum that Ortiz submitted to the JCRA had been materially altered from the original prepared by U.S. Bank, upon information and belief. A true and accurate copy of the original is attached as Exhibit H.

93.    The alterations to the memorandum are reflected in red below:

25

1. Thiago Franzese and Jose Ortiz are the sole signatories on the account and have the authority to sign on the account.
2. Thiago and Jose have the authority to pledge the account for collateral
3. The account is fully available to be pledged for collateral as it does not have any pledge at US bank.
4. Please see below for balance information:

94.     Unlike the version of the memorandum submitted by Ortiz to the JCRA, the original version from U.S. Bank reflected that Ortiz was *not* the sole signatory of the TZZ Investment Group account. Nor did it convey that Ortiz alone possessed "authority to liquidate the account," as stated in the altered version submitted to the JCRA. Rather, Ortiz was listed as a signatory with another individual, Thiago Franzese, and both had the authority to sign for the account. Both individuals also had the ability to "pledge the account for collateral," rather than Ortiz having the sole discretion "to liquidate the account." Upon information and belief, TZZ Investment Group's account at U.S. Bank was closed and emptied in or about April 2023.

95.     The Grand Jersey Plaintiffs and Sip Avenue Plaintiffs were unaware of Ortiz's alteration of this bank statement, and Ortiz never disclosed to them that he had submitted an altered bank statement to the JCRA in connection with the Grand Jersey and Sip Avenue projects.

96.     Upon information and belief, the Figliolias, on the other hand, not only knew about the bogus U.S. Bank document, they allegedly used it themselves to falsely represent their own finances in a separate real estate transaction. In an unrelated transaction concerning a property in Harrison, New Jersey, Louis Figliolia, Jr., allegedly sent the same U.S. Bank document concerning TZZ Investment Group to show that one of the Figliolia Companies, BGD, had sufficient funds to finance a transaction. *See BG Development LLC v. Eastone Equities LLC*, Docket No.: BER-C-

000172-24, First Amended Third-Party Complaint, ¶¶ 24, 36 (N.J. Sup. Ct. Dec. 24, 2024). That document allegedly was sent on or about August 14, 2023, which was, upon information and belief, months after the account at U.S. Bank was closed.

97.    After Ortiz submitted the altered U.S. Bank document to the JCRA, fraudulently misrepresenting his financial capabilities, Grand Jersey and the JCRA negotiated a Purchase and Sale Agreement ("PSA") and Redevelopment Agreement ("RDA") for the 185 Monmouth property over the course of 2023. The Grand Jersey Plaintiffs relied on Ortiz's misrepresentations, with Grand Jersey incurring millions in costs and the Grand Jersey Plaintiffs investing millions in contributions to the company.

98.    On or about January 25, 2024, Grand Jersey and the JCRA executed the PSA and RDA. A true and accurate copy of the PSA and RDA are attached as Exhibits I and J, respectively.

99.    The PSA called for Grand Jersey to purchase the property from the JCRA for $30,000,000 and set forth timeframes for the closing of the transaction and any extensions, including a due diligence period.

100.    Pursuant to the PSA, upon its execution, Grand Jersey owed the JCRA a $600,000 deposit. Upon information and belief, Grand Jersey paid the deposit using funds provided by the Grand Jersey Plaintiffs.

101.    Under the RDA, Grand Jersey was obligated to obtain and provide written evidence of financing to acquire the property and finance the construction project.

102.     Similarly, the PSA included representations from Grand Jersey that it had "sufficient funds to close this transaction, and/or will have sufficient funds at or before Closing," and, critically, that the transaction was "not contingent upon [Grand Jersey] obtaining institutional or other financing." In other words, Grand Jersey represented in the PSA that its ability to close the transaction did not depend on obtaining financing. The Grand Jersey Plaintiffs understood that the representation was based on the Ortiz Letter, in which he fraudulently claimed that he had total control of $56 million (he did not, upon information and belief).

103.     Pursuant to the RDA, the due diligence period ended on or about June 3, 2024, which meant that the deal was supposed to close on or before June 17, 2024.

104.     The RDA contained a clause that included that Grand Jersey could purchase an extension of the due diligence period for $100,000. Grand Jersey exercised their right to the extension and paid the JCRA $100,000 on March 1, 2024, again, upon information and belief, using funds provided by the Grand Jersey Plaintiffs.

105.     Separately, Sip Avenue and the JCRA negotiated, but never finalized agreements for the purchase and sale and redevelopment of the Sip Avenue property.

106.     Ortiz willfully failed to disclose to plaintiffs that he caused the altered U.S. Bank document to be submitted to the JCRA in February 2023, thereby fraudulently inducing the Grand Jersey Plaintiffs and the Sip Avenue Plaintiffs to continue to transact business with him.

107.    On or about February 5, 2024, Louis Figliolia, Jr. circulated a term sheet to George Figliolia and the Grand Jersey Plaintiffs, among others. The term sheet called for Ortiz, as the lender, to provide funding for the Grand Jersey project through one of his Forthright companies.

108.    On or about February 27, 2024, Ortiz sent a revised term sheet to George Figliolia, copying Louis Figliolia, Jr. The revised term sheet identified that CGA Servicing, LLC ("CGA"), a financial services company, would service the loan. Upon information and belief, this was false—CGA never agreed to provide funding for the Grand Jersey deal.

109.    On or about March 28, 2024, Grand Jersey and Forthright, Ortiz's entity, agreed to the term sheet (the "Grand Jersey Term Sheet"). This version also identified that CGA would service the loan and provided that the total loan amount would be $418,500,000 (including $65,000,000 of equity and $351,000,000 in a loan amount). This too was false, upon information and belief. A true and accurate copy of the Grand Jersey Term Sheet is attached as Exhibit K.

110.    Ortiz fraudulently induced the Grand Jersey Plaintiffs to agree to the Grand Jersey Term Sheet by falsely representing that CGA would finance the deal. Had the Grand Jersey Plaintiffs known that Ortiz had used an altered bank statement and falsely represented that CGA would provide financing, they never would have agreed to the Grand Jersey Term Sheet.

111.    The Grand Jersey Term Sheet provided that Ortiz would receive $300,000 as an expense deposit. Despite multiple requests, George Figliolia declined

29

to identify how much Ortiz was paid, or supply the records demonstrating those payments. Based on the limited records currently available to the Grand Jersey Plaintiffs, Grand Jersey paid out at least $167,000 for the benefit of Forthright, with another $133,000 appearing to be accounted for as an offset based on amounts Ortiz purported to owe to G Builders, George Figliolia's company. Upon information and belief, the payments to Forthright included in the $167,000 amount were made to third parties, including a communications company and an attorney.

112.    In addition to the payments from Grand Jersey, Ortiz also fraudulently obtained money from the Sip Avenue venture. Although a term sheet was neither agreed to, nor signed for Sip Avenue, George Figliolia nevertheless caused payments from Sip Avenue's bank account, which was entirely funded by the Sip Avenue Plaintiffs, to be made for Ortiz's benefit. Specifically, two separate payments of $50,000 came from a bank account for Sip Avenue to an attorney in the Bronx, New York. These payments for Ortiz's benefit were not disclosed to, nor authorized by, the Sip Avenue Plaintiffs. It was not until on or about December 27, 2024, that George Figliolia acknowledged that this $100,000 was paid for Ortiz's benefit.

113.    Ortiz's actions were committed in bad faith and with the intent to defraud plaintiffs. Had plaintiffs known that Ortiz had altered the Ortiz Letter, or falsely represented that he had an agreement with CGA, plaintiffs never would have agreed to the Grand Jersey Term Sheet.

**F.**  **Ortiz and the Figliolias Continue the Fraudulent Scheme by Making False Representations About Ortiz's Ability to Finance the Grand Jersey Transaction**

114.    Ortiz and the Figliolias' fraudulent conduct continued after they fraudulently induced the Grand Jersey Plaintiffs to agree to the Grand Jersey Term Sheet. Between June 2024 and October 2024, Ortiz was never able to provide financing for the Grand Jersey transaction, though he and George Figliolia continued to deceive the Grand Jersey Plaintiffs and produced still more fraudulent documents.

115.    On or about June 3, 2024, Ortiz requested an extension of the June 17, 2024 closing deadline for unspecified reasons. Grand Jersey asked the JCRA to extend the closing until June 27, 2024, and the JCRA agreed.

116.    Ortiz failed to close the transaction on June 27, 2024. On or about June 25, 2024, Ortiz advised that he would not be able to close on June 27, 2024, and that he needed an extension until July 9, 2024. Grand Jersey again requested an extension from the JCRA. The JCRA agreed.

117.    Ortiz failed to close the transaction on July 9, 2024. The closing was rescheduled for July 24, 2024.

118.    Ortiz failed to close the transaction on July 24, 2024. On or about July 22, 2024, Grand Jersey's counsel asked for some indication that the deal would close on July 24, to which Ortiz replied, "[z]ero shot." When counsel for Grand Jersey asked when they could realistically close, Ortiz replied, "while we appreciate the pressure you are under to close with the City, as a lender, I cannot rush the credit and risk underwriting process. We have diligently accommodated all of the many requests,

and have stayed the course at the strength of the relationship of the Figliolia team." The closing was rescheduled for August 15, 2024.

119.    Ortiz failed to close the transaction on August 15, 2024. On or about August 13, 2024, Ortiz, through counsel, advised that the closing would take place the week of August 26, 2024, and no later than on or about August 30, 2024.

120.    On or about August 19, 2024, at an in-person meeting that Ortiz attended via zoom with his counsel, the JCRA advised Grand Jersey that the closing needed to take place by the end of September 2024, or the deal would be terminated.

121.    Ortiz failed to close the transaction by August 30, 2024.

122.    The Figliolias sought to reassure the Grand Jersey Plaintiffs that Ortiz's financing arrangements were genuine, notwithstanding the delays. On or about September 1, 2024, George Figliolia sent a text message to Salmieri stating that Ortiz was "trying to get a letter today, confirming from the bank that it's [*sic*] scheduled and on all the lights green in front of us." George Figliolia later texted, "Jose [Ortiz] just texted me a little while ago . . . Let us come in today. I'll share it with you as soon as I have it."

123.    Later that night, at approximately 7:35 p.m., George Figliolia again texted, "[h]ave [the financing letter] already Jose [Ortiz] need to redact his deal terms that are also included we will be doing it as [soon] as we are back home." Upon information and belief, George Figliolia was explaining that he and Ortiz would redact the deal terms together.

32

124.  On or about September 1, 2024, at approximately 9:50 p.m. and again at approximately 10:03 p.m., George Figliolia sent a document, which purported to be from CGA, to the Grand Jersey Plaintiffs, Ortiz, and Louis Figliolia, Jr., among others. In the email, George Figliolia wrote: "For your eyes only deal points with parties redacted by Jose [Ortiz]." The letter stated that CGA would provide financing to Forthright V for Grand Jersey. The version of the letter that Ortiz provided to the Grand Jersey Plaintiffs was substantially redacted and incomplete. Ortiz and the Figliolias never explained the reason for the redactions.

125.  The document was a complete fabrication. CGA not only never prepared the document, they were never approached about the transaction, upon information and belief. The fake CGA document was prepared and provided by Ortiz and the Figliolias to continue the fraudulent scheme to obtain the plaintiffs' investments, upon information and belief. A true and accurate copy of the fake CGA letter is attached as Exhibit L.

126.  On or about September 12, 2024, Ortiz forwarded to George Figliolia an email string that purported to be an email exchange between Ortiz and a CGA employee from the same day. The email exchange purported to show the following exchange between Ortiz and the CGA employee:

Ortiz:      [CGA Employee] Har [*sic*] to tell we are in the tail end of this opportunity. I appreciate the call earlier, and I look forward to execution. Let me know if you're around to chat.

CGA:      Jose- we are committed to execution, I think it is clear as we keep trying to accommodate a successful closing. We are committed to close by month's end. If that doesn't work – let me know what does.

33

Ortiz appeared to have copied Marcus Asante ("Asante") from Birchcrest Advisors on the email. After apparently forwarding the email to himself, George Figliolia then forwarded the email exchange to the Grand Jersey Plaintiffs. A true and accurate copy of the email string is attached as Exhibit M.

127.    The email chain between Ortiz and the CGA Employee was another complete fabrication, upon information and belief. Ortiz never discussed this Grand Jersey transaction with CGA and did not have an email exchange with the CGA employee on September 12, 2024.

128.    Ortiz and George Figliolia continued to maintain the false pretense that CGA would provide the financing for the transaction. On or about September 16, 2024, George Figliolia wrote to the Grand Jersey Plaintiffs, Louis Figliolia, Jr. and others that Ortiz was having a meeting with CGA that day. Later that same day, George Figliolia wrote that "Owner of CGA said he will have a date certain tomorrow." Subsequently, upon information and belief, on or about October 15, 2024, George Figliolia informed the Grand Jersey Plaintiffs that Ortiz was having a meeting with CGA that day. None of these claims were true, upon information and belief.

129.    The fake CGA document listed a law firm as counsel for one of the parties. As the closing date continued to slip, counsel for Grand Jersey contacted that law firm. In response, on or about October 18, 2024, Asante, apparently writing on behalf of Ortiz, wrote to Grand Jersey's counsel, copying Ortiz and George Figliolia, stating, "[o]ur council [*sic*] at [a law firm] advised us that they received a call and an

email from [counsel for Grand Jersey]. We didn't authorize the call and email, and I would like to let you know that these actions were started outside of our standard protocol. This deviation could tarnish our professional reputation and ultimately harm this transaction by intimating issues that CGA and the insurers were unaware of. We need to act quickly to resolve this. Do you have any suggestions on how to salvage this circumstance?" Upon information and belief, Asante's claims were bogus and simply part of Ortiz and the Figliolias' scheme to defraud the Grand Jersey Plaintiffs.

130.    Upon information and belief, Ortiz *never* discussed the Grand Jersey transaction or the Sip Avenue transaction with CGA, and CGA *never* sent Ortiz any documents related to the deals. Upon information and belief, Ortiz, with the assistance of the Figliolias, created a false CGA letter and a false email purportedly from CGA, all to continue the fraudulent pretense that he could provide financing for the Grand Jersey transaction, when he could not.

131.    After producing the bogus CGA document, on or about September 3, 2024, Ortiz, through counsel, advised that Grand Jersey should be prepared to close on September 11, 2024.

132.    Ortiz failed to close the transaction on September 11, 2024. Upon information and belief, on or about September 12, 2024, Ortiz, through counsel, advised that closing would occur by September 30, 2024.

133.    On or about September 13, 2024, the JCRA sent a letter to Grand Jersey stating that if they did not close the deal on or by September 25, 2024, the RDA, the PSA, and the designation as redeveloper would be terminated.

134.    On or about September 17, 2024, the JCRA sent Grand Jersey a Notice of Default and advised that if the closing did not occur by September 25, 2024, the RDA and PSA would be terminated.

135.    On or about September 17, 2024, Ortiz, through counsel, advised that closing would occur by September 25, 2024.

136.    On or about September 23, 2024, Ortiz wrote to his counsel, the Figliolias, and the Grand Jersey Plaintiffs, "Gents: As per our conversation I am confirming that Monday September 30th has been earmarked to close Grand Jersey." On or about September 23, 2024, Ortiz also wrote a similar email to the same group, "Gentlemen: Great to catch up….I am confirming the ability to close on Monday September 30."

137.    On or about September 25, 2024, Grand Jersey sent a request to the JCRA to request that the closing date be moved to September 30, 2024.

138.    On or about September 27, 2024, the JCRA agreed to extend the closing deadline to September 30, 2024, in exchange for Grand Jersey paying a $100,000 closing extension fee to the JCRA.

139.    Ortiz failed to close the transaction on September 30, 2024, advising, through counsel, on September 30, 2024, and October 2, 2024, that he would continue to work on the funding, but failing to provide any reasons for his continuing inability

to close the transaction and fulfill his agreement with Grand Jersey, or provide a date by when he would receive the funding.

140.    On or about September 30, 2024, Ortiz's counsel wrote to Grand Jersey's counsel, "[o]ur client is still in the process of closing his funding. I am told by our client that your client was aware that Jose [Ortiz] is closing that funding deal today. Please feel free to speak to George [Figliolia] and confirm."

141.    On or about September 30, 2024, Ortiz's counsel wrote to Grand Jersey's counsel, "I just received this update from Jose [Ortiz]: '[counsel]: had a tumultuous day attempting to execute on the first part of the funding, and will continue to work tomorrow on the closing of our funding of the opportunity. I hope to be in a position to fund on The Grand [Jersey] tomorrow."

142.    On or about October 2, 2024, Ortiz's wrote to Grand Jersey's counsel, "Jose [Ortiz] asked me to convey that he has made the closing an absolute priority for Forthright as soon as the money for the funding is received, and that he will advise the group at once when it is. He is at this point waiting on the funds and has no issues to report."

143.    On or about October 7, 2024, George Figliolia arranged for a video conference attended by the Figliolias and representatives of the Grand Jersey Plaintiffs with Asante and another individual. Asante and the other individual purported to be Ortiz's "insurance consultants" for the financing of the Grand Jersey transaction. Upon information and belief, there was no financing and Asante and the

other individual were merely continuing to execute Ortiz and the Figliolias'
fraudulent scheme.

144.    On or about October 10, 2024, the JCRA advised Grand Jersey that it
would present a resolution terminating the RDA and PSA to its board for approval
on October 15, 2024.

145.    On or about October 17, 2024, Ortiz wrote to his counsel, the Figliolias,
and Asante that "[i]n light of the new information, please send the closing invite, to
the group for the 30th at noon. Please title the closing: Real House wives of NJ finale."

146.    On or about October 18, 2024, in response to a request from Ortiz's
counsel to extend the closing deadline to October 30, 2024, the JCRA notified Grand
Jersey and Ortiz, through counsel, that the JCRA would agree to the extension
provided that Grand Jersey pay $200,000 to the JCRA (representing an additional
$100,000 extension fee in addition to the previous unpaid fee to extend the closing to
September 30, 2024), and that Grand Jersey and Ortiz release claims against the
JCRA. The JCRA required payment and the releases by October 21, 2024.

147.    On or about October 22, 2024, the Grand Jersey Plaintiffs received from
U.S. Bank the original document regarding the TZZ Investment Group account,
which revealed that Ortiz had submitted an altered document to the JCRA and had
been executing a fraud and acting in bad faith all along.

148.    The deal did not close. On or about October 24, 2024, the JCRA sent a
letter to counsel for Grand Jersey terminating the agreement as of that date.

149.    Upon information and belief, the closing was postponed at least ten times, mostly because of Ortiz's inability to close. Ortiz's delays generally occurred without explanation as to the reasons for delay. The Grand Jersey Plaintiffs continued to rely on Ortiz's misrepresentations that he needed additional extensions for the closing, to their financial detriment.

150.    Upon information and belief, Ortiz's inability to close the transaction caused the JCRA to terminate the Grand Jersey transaction, causing the Grand Jersey Plaintiffs significant financial harm, including significant expenditures for payments to the JCRA, the construction and planning of the project, as well as reputational harm.

151.    Upon information and belief, throughout the dealings with Ortiz, the Figliolias excluded the Grand Jersey Plaintiffs from communications with Ortiz and refused to share details of their negotiations.

152.    The Grand Jersey Plaintiffs relied on Ortiz to act in good faith and to provide accurate and true financial statements, and to apprise the Grand Jersey Plaintiffs of any material changes to the funding. The Grand Jersey Plaintiffs relied on Ortiz's representations that he had the funds available for the project when Grand Jersey entered into the agreements with the JCRA and the Grand Jersey Term Sheet. The Grand Jersey Plaintiffs also relied on Ortiz and the Figliolias' representations that CGA would provide the financing. By submitting multiple altered documents that fundamentally misrepresented his financial status and ability to fund the deal,

Ortiz defrauded plaintiffs and caused them significant damages, including expenditures related to the Grand Jersey and Sip Avenue projects.

### G.    Grand Jersey Is a Non-Functioning LLC Because of the Figliolias' Fraud and Misconduct

153.    Because of the fraudulent conduct of the Figliolias and Ortiz, the Grand Jersey transaction never closed, the JCRA terminated its agreements with Grand Jersey, and the Grand Jersey Plaintiffs face the loss of their entire investment. In response, the Figliolias and Ortiz have closed ranks, frozen the Grand Jersey Plaintiffs out of the LLC, and taken numerous actions over the Grand Jersey Plaintiffs' objections, including threatening to sue the JCRA and causing liens to be placed on JCRA property. This conduct has left Grand Jersey as a non-functioning LLC, harming the Grand Jersey Plaintiff's interests. This misconduct is described below.

154.    By October 18, 2024, Ortiz had repeatedly breached his obligations under the Grand Jersey Term Sheet. Notwithstanding those breaches, George Figliolia sought to commit Grand Jersey to paying $200,000 to the JCRA for an extension. Moreover, George Figliolia sought to negotiate a release of liability for all parties, including Ortiz.

155.    The Grand Jersey Plaintiffs declined to immediately agree with George Figliolia's position about the releases, and, because the matter was outside the ordinary course of Grand Jersey's business, called for a vote of the members, which would require the affirmative vote of the Grand Jersey Plaintiffs.

156.    Notwithstanding the Grand Jersey Plaintiffs' objection, on or about October 20, 2024, George Figliolia sent the JCRA (through its counsel) an email requesting mutual releases for all parties (including Ortiz) and that the JCRA set aside another issue with the property. George Figliolia claims to have reviewed the extension agreement with "the respective parties," but named only Louis Figliolia, Jr.

157.    On or about October 20, 2024, the Grand Jersey Plaintiffs, through counsel, advised the JCRA that George Figliolia's communication was unauthorized by the majority of Grand Jersey's members and did not represent Grand Jersey's position.

158.    On or about October 22, 2024, the JCRA sent a letter to Grand Jersey, through counsel, demanding a meeting that day with Ortiz and the individual from U.S. Bank who authored the altered memorandum that Ortiz submitted to the JCRA. Upon information and belief, Ortiz failed to appear for that meeting.

159.    On or about October 24, 2024, the JCRA sent a letter to Grand Jersey advising that its board had terminated the RDA and PSA, citing the failure to close. A true and accurate copy of the JCRA's letter is attached as Exhibit N.

160.    Over the Grand Jersey Plaintiffs' objection, on or about October 25, 2024, Louis Figliolia, Jr. wrote to the JCRA asserting that all communications and direction should come from him as Managing Member of the Grand Jersey Group, claiming that he had "sole discretion and decision making in the Membership," in clear contravention of the Grand Jersey Operating Agreement, which required the

Grand Jersey Plaintiffs' approval for actions outside the ordinary course of business. Louis Figliolia, Jr. further accused the JCRA of defaulting on its obligations under the PSA and RDA, a position that was neither discussed with, nor approved by the Grand Jersey Plaintiffs. A true and accurate copy of this letter is attached as Exhibit O.

161.   Upon information and belief, prior to Louis Figliolia, Jr. sending his October 25, 2024 letter to the JCRA, over the objection of the Grand Jersey Plaintiffs, George Figliolia and Louis Figliolia, Jr. directed Grand Jersey's counsel to communicate to the JCRA that the JCRA had breached the RSA and PSA. Upon information and belief, counsel resigned from representing Grand Jersey after this direction.

162.   George Figliolia and Louis Figliolia, Jr. have continued to freeze out the Grand Jersey Plaintiffs from the companies' operations, ignore their requests, and act over their objections. Specific examples are described below.

### 1.   *The Figliolias Cover Up Ortiz's Fraud*

163.   Prior to the termination of the PSA and RDA, the Figliolias were questioned by plaintiffs about the legitimacy of the purported U.S. Bank document, but declined to investigate, with George Figliolia claiming: "I don't poke bears…"

164.   On or about October 24, 2024, the Grand Jersey Plaintiffs alerted the Figliolias of Ortiz's submission of the altered letter to the JCRA. The Grand Jersey Plaintiffs requested that the Figliolias demand answers from Ortiz and notify Ortiz that his conduct breached the Grand Jersey Term Sheet.

165.    The Figliolias ignored these requests. Upon information and belief, they have neither demanded that Ortiz explain his fraud, nor notified Ortiz that he breached the Grand Jersey Term Sheet. Upon information and belief, the Figliolias appear to have used the altered U.S. Bank document to purportedly show their ability to finance an entirely separate real estate transaction, as described above in Section II.E. In other words, upon information and belief, both Ortiz and the Figliolias have used the altered U.S. Bank document to commit fraud.

166.    George Figliolia's statements regarding his knowledge of Ortiz's fraud have been contradictory. In an email from October 25, 2024, George Figliolia claimed that "[w]e have learned the account amount was accurate," seeming to vouch for the accuracy of Ortiz's altered U.S. Bank statement. Then, in a letter dated November 4, 2024, George Figliolia appeared to distance himself from Ortiz, writing to the Grand Jersey Plaintiffs (through counsel) that "the actions taken by Forthright Holdings V, LLC [*i.e.*, Ortiz] were undertaken independently and do not represent our collective actions." Then, on or about December 23, 2024, George Figliolia claimed he did not have enough information, stating "I await those holding detail to forward same [*sic*], I've only been 3rd party told."

167.    Louis Figliolia, Jr.'s statements contradict those of George Figliolia. In a letter to the JCRA dated February 6, 2025, Figliolia, Jr. claimed "we [the Figliolias] have not participated in altering documents of any kind," but that "we were informed by one of our attorneys that the redact of the bank statement was to remove the contact person's name no longer involved and that the funds were confirmed to be in

place." Figliolia, Jr. did not answer when he received this information or offer any explanation as to why such a "redaction" would not be disclosed to the Grand Jersey Plaintiffs or the JCRA.

### 2. The Figliolias Make Claims to the JCRA Over the Grand Jersey Plaintiffs' Objections

168.    After the JCRA terminated the PSA and RDA, the Grand Jersey Plaintiffs sought to engage with the Figliolias about next steps, but did not approve communications to the JCRA in response to the termination of the PSA and RDA.

169.    Nevertheless, the Figliolias made unauthorized and inaccurate claims in correspondence to the JCRA that purported to be from Grand Jersey, including letters to the JCRA on or about October 25, 2024, October 30, 2024, November 8, 2024, January 29, 2025, and February 6, 2025.

170.    On or about October 25, 2024, Louis Figliolia, Jr. wrote to the JCRA's counsel acknowledging receipt of the termination of the PSA and RDA, but claiming that the notification "did not mention [the JCRA's] related default," referring to an easement issue impacting the property that, upon information and belief, had been resolved during due diligence. Upon information and belief, the Figliolias have sought to use the easement issue as a pretense to claim that the JCRA breached the PSA and RDA. The Grand Jersey Plaintiffs never authorized such a claim.

171.    On October 30, 2024, George Figliolia wrote in a letter to the JCRA, "we were asked to close on a property not fully owned by the JCRA, simply put, we asked for indemnification to this issue, and even after persistent follow up, no response was given. We remind you our contract requires you to deliver this land, and that it is

needed as the intersection of the project development." This communication was not authorized by the Grand Jersey Plaintiffs and, upon information and belief, is yet another reference to the easement issue resolved during due diligence.

172.   In another example, in his November 8, 2024 letter, George Figliolia claimed that the JCRA was responsible for "material issues that hindered the closing process," including not delivering title "at the time of closing" or initiating certain eminent domain proceedings. George Figliolia further claimed that "these omissions constitute a breach of our contractual agreement." This communication was not authorized by the Grand Jersey Plaintiffs and, upon information and belief, is yet another reference to the easement issue resolved during due diligence. George Figliolia also made the false claim that Grand Jersey "remain prepared to proceed with the closing at the earliest possible opportunity," which was untrue because Ortiz was never prepared to close the transaction.

173.   Prior to sending this November 8, 2024 letter to the JCRA, George Figliolia shared a draft of it with the Grand Jersey Plaintiffs, who objected to the letter and the claims made in it, and notified George Figliolia that he was not authorized to send the letter on behalf of Grand Jersey. George Figliolia sent it to the JCRA anyway. George Figliolia also excluded the Grand Jersey Plaintiffs from his email transmitting the letter to the JCRA.

174.   Upon information and belief, George Figliolia allowed Ortiz to review and edit the November 8, 2024 letter to the JCRA. According to the metadata for the draft of the letter, Ortiz was the last editor of the document on the date the draft

letter was sent to the Grand Jersey Plaintiffs. Despite Ortiz's fraud and breaches of the Grand Jersey Term Sheet, George Figliolia still allowed Ortiz to review and edit the letter.

175.   Despite numerous demands by the Grand Jersey Plaintiffs to cease taking actions or making communications on behalf of Grand Jersey, the Figliolias continue to disregard their positions and act contrary to the company's best interests. Indeed, on or about January 29, 2025, George Figliolia sent an email to the JCRA's counsel stating that the Figliolias "are proceeding to allow liens to be placed on both projects," referring to Grand Jersey and Sip Avenue. Upon information and belief, George Figliolia was claiming that he would cause contractors to place liens on JCRA property. In fact, George Figliolia and DNG1, one of the Figliolia Companies, filed a lien on the JCRA's Grand Jersey property on or about January 30, 2025, for over $2.7 million—a figure unsupported by any documentary evidence available to the Grand Jersey Plaintiffs. Upon information and belief, the Figliolias knew that New Jersey law prohibits the filing of a lien against a public entity. These actions were unauthorized by the Grand Jersey Plaintiffs and are harmful to Grand Jersey's interests.

176.   In his email to the JCRA's counsel, George Figliolia also accused the JCRA of violating non-disclosure agreements. Upon information and belief, there are no applicable non-disclosure agreements.

177.   On or about January 30, 2025, the JCRA responded to the Figliolias making clear that the JCRA terminated the transaction because of the failure to

close, that the deal would have been terminated anyway when the JCRA discovered Ortiz's use of the altered U.S. Bank document, and that the Figliolias threats against JCRA property were unacceptable. The JCRA's counsel also noted that the use of the altered documents had been reported to law enforcement.

178.    As demonstrated by these actions, the Figliolias have acted over the objections of the Grand Jersey Plaintiffs, used the LLC to execute a fraud, and placed the LLC in legal jeopardy.

### 3. *The Figliolias Refuse to Produce Books and Records, and Falsely Claim to Conduct an Accounting*

179.    The Grand Jersey Plaintiffs and Sip Avenue Plaintiffs do not know with specificity how the Figliolias spent their investments (other than paying themselves and Ortiz), and the Figliolias have steadfastly refused that transparency.

180.    Pursuant to the Grand Jersey Operating Agreement, "Membership Rights" include "the right to inspect the Company's books and records." Section 8.2 of the Grand Jersey Operating Agreement also states:

- "The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business."

- "The books and records shall be maintained in accordance with sound accounting practices and shall be available at the company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours."

- "Any request for information shall be in writing and shall state with specificity the information sought and the purpose thereof."

181.    Since at least in or about September 2024, plaintiffs have requested—in writing and with specificity—an inspection and accounting of Grand Jersey's and Sip

Avenue's books and records, including bank statements and expenses. Despite multiple follow-up requests, the Figliolias and Garcia have failed to provide either the books and records or an accounting for Grand Jersey and Sip Avenue.

182.   On or about October 25, 2024, George Figliolia claimed that an accounting was underway and would be completed shortly. This was false, upon information and belief; no accounting has taken place, despite George Figliolia's representations.

183.   On or about November 4, 2024, George Figliolia sent the Grand Jersey Plaintiffs, through counsel, a letter, writing that "[a]n extensive accounting process is currently underway to document and project all related expenses up to and including November 15, 2024. We anticipate completion of this accounting exercise later this week." George Figliolia and his associates never provided this accounting.

184.   On or about December 23, 2024, in response to an agenda for a call between George Figliolia, Louis Figliolia, Jr., the plaintiffs, and counsel for the plaintiffs, George Figliolia continued to claim that plaintiffs had "complete access" to all of the books and records and had had them for over a year. This was untrue.

185.   On or about December 27, 2024, George Figliolia falsely claimed that the Grand Jersey Plaintiffs had access to the complete books and records via a software program. But the records in the software program are worthless because they contain incomplete and inaccurate information for Grand Jersey and nothing for Sip Avenue.

186. On or about January 13, 2025, George Figliolia again claimed in writing that information regarding the books and records was in the software program and there was nothing missing. This was not true.

### 4. *The Figliolias Paid Themselves, but Not Grand Jersey's Invoices*

187. On or about December 16, 2024, Grand Jersey received a notice and construction lien from a company for unpaid invoices for work that they did for Grand Jersey. The amount of the lien was for $26,000 and the lien, dated on or about December 11, 2024, was placed on the Grand Jersey property, which the JCRA owns, not Grand Jersey.

188. On or about December 24, 2024, attorneys for another company sent a letter to Louis Figliolia, Jr. alleging that it had conducted work for Grand Jersey and $450,888.92 plus accrued interest was outstanding. The Grand Jersey Plaintiffs do not have the records to understand the scope of work or the propriety of the invoices. The information that the Figliolias and Garcia have provided does not match up with the invoices and bank statements.

189. On or about December 30, 2024, Grand Jersey received a mechanic's lien from a subcontractor purportedly owed $427,221.45 for services. The lien was also placed on the Grand Jersey property. Because the Figliolias have refused to provide Grand Jersey's records and an accounting, the Grand Jersey Plaintiffs do not have sufficient records to respond to any of these claims.

190. Upon information and belief, despite failing to pay vendor's invoices, George Figliolia and his companies, including DBG1 and GBD3, were paid for their

work during the period of time when they were failing to pay other invoices. Despite those payments, on or about January 30, 2025, the Figliolias caused the filing of a lien on the JCRA's Grand Jersey property claiming over $2.7 million in payments owed.

### 5. The Figliolias Continue to Incur Expenses to Grand Jersey and Sip Avenue and Continue to Bill for Millions of Dollars of Purported Work

191.    Upon information and belief, despite an explicit agreement to stop work, and in disregard of the JCRA's termination of the PSA and RDA, George Figliolia and Louis Figliolia, Jr. continued to perform work on the Grand Jersey property and incur expenses related to Grand Jersey.

192.    Upon information and belief, at a meeting in August 2024, the Sip Avenue Plaintiffs and George Figliolia agreed to suspend all expenditures on Sip Avenue. On or about September 12, 2024, George Figliolia confirmed that they had suspended expenditures.

193.    On or about November 4, 2024, George Figliolia told the Grand Jersey Plaintiffs, through counsel, that "[a]ll parties consented to initiate an orderly cessation of on-site operations, subject to the acquisition of any necessary permits to remove equipment from the premises."

194.    Despite failing to make required capital contributions and the orders to stop work, the Figliolias continued to try and extract money from Grand Jersey and Sip Avenue through invoices from their companies.

195.    Specifically, on or about November 5, 2024, the Figliolias caused the sending of two large bills that were invoiced to the Grand Jersey Group from G

Builders and DNG1. The G Builders bill called for the payment of $40,450 for "Collection Gathering Services," but had no detail at all despite claiming well over one hundred hours of work supposedly done by Louis Figliolia, Jr., George Figliolia, and numerous others. The DNG1 bill for $58,416.20 and was not certified by the architect, as required.

196.    On or about December 20, 2024, G Builders sent two statements of outstanding invoices to plaintiffs, one for Grand Jersey for $2,830,981.67 and the other for Sip Avenue for $30,702.78. The two statements were devoid of details—only including invoice numbers, date, balance due, and job location. Additionally, three of the invoices listed on the Grand Jersey statement of outstanding invoices were for DNG1, a Figliolia company. Plaintiffs have not received all of the DNG1 invoices. Additionally, certain of the invoices did not match up with the records in plaintiffs' possession and the invoices listed did not match up with a report listing invoices by job.

197.    Just over a month later, the Figliolias inflated their invoices to absurd levels. On or about January 30, 2025, G Builders sent plaintiffs an invoice for Grand Jersey totaling $11,813,602.24 and an outstanding invoice for Sip Avenue for $1,831,296.72, which also included a finance charge at 1.5% per month. The invoices were completely devoid of supporting information and for each outstanding invoice, only included invoice number, date, balance due, and job location. The Grand Jersey bill included an invoice from December 20, 2024, for $7,893,978.11. The Sip Avenue

bill included an invoice for $1,800,000 from January 15, 2025. Plaintiffs never received those underlying bills, and all work had been stopped for months.

198.   Upon information and belief, certain if not all the invoices are from DNG1. On or about May 8, 2024, Louis Figliolia, Jr., on behalf of Grand Jersey, entered into an agreement with DNG1, owned by George Figliolia, for "Construction Management Services." The contract between DNG1 and Grand Jersey was incomplete and there were numerous blanks for missing information.

199.   Section 5.4.3 of the Grand Jersey Operating Agreement requires dealing with any affiliated companies to be done at arm's length and on commercially reasonable terms. Upon information and belief, the agreement between Grand Jersey and DBG1 was not at arm's length, and, as demonstrated by its recent invoices, it was not on commercially reasonable terms.

### 6.   *The Figliolias Have Unauthorized Dealings with Unknown Parties Purportedly on Behalf of Grand Jersey*

200.   Upon information and belief, the Figliolias are attempting to sell Grand Jersey's assets in secret and without the participation of the Grand Jersey Plaintiffs.

201.   Sections 5.1.3.15 and 5.1.4.1 of the Grand Jersey Operating Agreement provide that "the Manager shall not undertake any of the following on behalf of the Company without the unanimous approval of the Members . . . the sale or refinancing of all or substantially all of the Company's assets."

202.   On or about November 25, 2024, Louis Figliolia, Jr. sent an email to Grand Jersey's title company referencing "[o]ur potential new partner." George Figliolia and Louis Figliolia, Jr. have refused to disclose who this "new partner" is to

the Grand Jersey Plaintiffs, despite the Grand Jersey Operating Agreement's express provisions requiring the Grand Jersey Plaintiff's approval of any asset sale.

203.    The Grand Jersey Plaintiffs asked repeatedly with whom the Figliolias were negotiating. To date, the Figliolias have refused to provide the identity of such parties.

204.    On or about November 27, 2024, George Figliolia wrote to counsel for the Grand Jersey Plaintiffs that "[w]e will share the results of our endeavors when we deem appropriate."

205.    On or about December 17, 2024, George Figliolia wrote to counsel for the Grand Jersey Plaintiffs, that "as the agreement actually affords, we will bring our update forward when ready as and if required."

206.    On or about December 27, 2024, George Figliolia wrote that they would "bring forward [the identity of the counterparty] when mature." To date, this has not happened.

*    *    *

207.    As detailed above, the Figliolias have made it impossible for Grand Jersey to operate in its current form with George Figliolia as a Member and Louis Figliolia, Jr. as the manager. As described above, George Figliolia has acknowledged freezing out the Grand Jersey Plaintiffs, and continuing to act over their objections. Upon information and belief, the Figliolias' conduct has led to a nonfunctioning company. Grand Jersey in its current state is unable to fulfill its purpose because of the Figliolias' fraudulent conduct and their breaches of both contract and their fiduciary duties. That conduct includes failing to contribute capital and lying about

doing so, failing to take action against Ortiz, failing to provide the requested accounting materials, acting over the Grand Jersey Plaintiffs' objections, and acting detrimentally to the interest of the LLC.

208. The Grand Jersey Plaintiffs seek control of the LLC to evaluate next steps. However, that cannot be done with the involvement of the Figliolias who defrauded the Grand Jersey Plaintiffs, aided in Ortiz's fraud, embezzled the Grand Jersey Plaintiffs' investments, and sought to embezzle more. Only judicial intervention can excise the Figliolias from the LLC.

209. Plaintiffs did not make a demand upon the other members or the manager of Grand Jersey pursuant to N.J.S.A. § 42:2C-68 that the Company bring these causes of action because such a demand would have been futile in connection with the subject closely-held entity. These allegations are based upon the Figliolias' wrongful conduct and any such demand would have required the Figliolias to initiate a lawsuit themselves.

## V.    REMEDIES SOUGHT

210. The Figliolias' *ultra vires* conduct, egregious mismanagement, and numerous fraudulent activities have irreparably injured plaintiffs and rendered Grand Jersey unable to function. Their immediate removal and dissociation from the company is necessary so that the Grand Jersey Plaintiffs can determine next steps for the business. Alternatively, the Grand Jersey should be dissolved and its assets sold as it is not reasonably practicable to carry on the company's business for which it was created. Furthermore, considering the Figliolias egregious conduct and failure

to contribute capital, George Figliolia's shares in Grand Jersey (through GBD3) should be forfeited to plaintiffs at no cost to plaintiffs.

211.    Plaintiffs seek a full accounting of the books and records of Grand Jersey and Sip Avenue.

212.    Plaintiffs seek the return of all funds illegally obtained by the Figliolias, the Figliolia Companies, and their associates. Such drastic relief is necessary due to the Figliolias' fraudulent conduct, their payments to themselves but not their vendors, their refusal to cooperate or follow instructions, and the high likelihood that assets and documentation will be hidden and destroyed. Plaintiffs already have received a lien and two demands for payment from companies other than those associated with the Figliolias, threating legal action for bills that the Figliolias failed to pay. Upon information and belief, there will likely be additional claims for payment caused by the Figliolias' fraudulent conduct.

213.    For the same reasons, plaintiffs seek to impose a constructive trust on George Figliolia's assets and the assets of the Figliolia Companies, as well as the Figliolia Family Dynasty Trust, which upon information and belief, George Figliolia funnels money to and is a beneficiary of. Plaintiffs seek the court's permission to pierce the corporate form of the Figliolia Companies, including any later discovered companies, to recoup their embezzled funds. Plaintiffs also seek to pierce the corporate form of the Figliolia Family Dynasty Trust to recoup their funds.

214.    Plaintiffs also seek the return of all funds paid to Ortiz from the companies, including the return of the Expense Deposit paid for Grand Jersey.

Plaintiffs seek the court's permission to pierce the corporate form of Ortiz's Companies, including any later discovered companies, to recoup their funds.

215.    Plaintiffs further seek the recovery of the $600,000 that Grand Jersey paid to the JCRA as a deposit, pursuant to the Purchase and Sale and Redevelopment Agreements, as well as the $100,000 extension deposit. Plaintiffs seek the return of the deposit amounts from George Figliolia and Ortiz, since they would not have entered into the agreements with the JCRA and paid the deposits if they had known the truth about the lack of funding.

216.    Plaintiffs seek compensatory and consequential damages, as may be determined, for the harm caused by all of the defendants' conduct, as well as punitive damages, reasonable attorneys' fees incurred in bringing this action, pre-judgment and post-judgment interest, as applicable, in an amount to be determined by the Court, and such other relief that the Court deems just and equitable under the circumstances.

## COUNT 1
**(Involuntary Dissociation of George Figliolia and GBD3 Pursuant to the Revised Uniform Limited Liability Company Act)**

217.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

218.    Judicial dissociation is warranted on the grounds specified in N.J.S.A. § 42:2C-46(e)(1) – (3).

219.    George Figliolia and GBD3 have violated N.J.S.A. § 42:2C-39 and the Grand Jersey Operating Agreement by their breaches of the duties of loyalty and care and refusal to provide for an accounting pursuant to N.J.S.A. § 42:1A-23 and the Grand Jersey Operating Agreement.

220.    Specifically, as detailed above, Grand Jersey is unable to function and will not be able to carry out the business purpose for which it was created with George Figliolia and GBD3 associated and with Louis Figliolia, Jr. serving as manager, who the Grand Jersey Plaintiffs are unable to remove while George Figliolia is associated.

221.    The actions taken by George Figliolia and GBD3 undermine the trust between the parties and third-parties, making it impossible to continue to conduct the business of Grand Jersey.

222.    George Figliolia and GBD3 have acted in bad faith, arbitrarily, and in direct contravention of their duties as a member of Grand Jersey.

223.    The Figliolias' actions have resulted in the need for judicial intervention and dissociation pursuant to N.J.S.A. § 42:2C-46(e).

## COUNT 2
**(Violations of the Revised Uniform Limited Liability Company Act
Against George Figliolia, Louis Figliolia, Jr., and GBD3)**

224.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

225.    The Revised Uniform Limited Liability Company Act, N.J.S.A. § 42:2C-1 *et seq.* (the "Act"), governs the responsibilities of shareholders and managers of limited liability companies.

226.    George Figliolia, Louis Figliolia, Jr., and GBD3's actions, as described above, violate the duties of loyalty and care required by N.J.S.A. § 42:2C-39, as well as the Grand Jersey Operating Agreement.

227.    George Figliolia, Louis Figliolia, Jr., and GBD3's actions also include the failure to provide for an accounting of the books and records, as required by N.J.S.A. § 42:1A-23 and the Grand Jersey Operating Agreement.

228.    As a result of George Figliolia, Louis Figliolia, Jr., and GBD3's violations of the Act, plaintiffs have been, and continue to suffer, damages.

## COUNT 3
**(Request for Dissolution of Grand Jersey Pursuant to N.J.S.A. § 42:2C-48(a)(4) and (a)(5) Against George Figliolia and GBD3)**

229.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

230.    As an alternative to dissociation of George Filiglia and GBD3, the Grand Jersey Plaintiffs seek dissolution of Grand Jersey. Judicial dissolution is warranted pursuant to N.J.S.A. §§ 42:2C-48(a)(4) - (5) when it is not reasonably practicable to carry on the purpose for which the company was created as set forth in the operating agreement and when the manager or those in control of the company are acting in a manner that is oppressive and "was, is, or will be directly harmful to the applicant."

231.    Together, the Grand Jersey Plaintiffs own a 38% interest in Grand Jersey while GBD3 owns a 49% interest, and two other entities own a combined 13% interest.

232.    Grand Jersey's purpose has been frustrated by the fraudulent acts and breaches of loyalty of the Figliolias and Ortiz who are in control of the company and are acting in a manner that is harmful to the plaintiffs.

233.    The Figliolias and GBD3 have acted in bad faith toward Grand Jersey.

234.    It is impossible for the Grand Jersey Plaintiffs, the Figliolias and GBD3 to continue a business relationship. The Grand Jersey Plaintiffs should be provided with GBD3's 49% interest in Grand Jersey at no cost considering the monies wrongfully taken by the Figliolias and GBD3.

## COUNT 4

**(Production and Inspection of Corporate Books and Records of Grand Jersey and Sip Avenue Against the Figliolias, Garcia, and GBD3)**

235.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

236.    Under N.J.S.A. § 42:2C-1, *et seq.* of the Act, shareholders have a right to inspect the books and records of a company upon demand.

237.    The Grand Jersey Plaintiffs also have a right pursuant to Section VIII of the Operating Agreement, to inspect the books and records of the company.

238.    The Sip Avenue Plaintiffs also have a right to an accounting of their investments based upon their reliance on the Figliolias and Garcia.

239.    The Figliolias, Garcia, and GBD3's actions in refusing to provide for an accounting of the books and records of Grand Jersey, including expenditures and bank statements, despite follow-up requests are in clear violation of the Act and the Grand Jersey Operating Agreement.

240.    As a result of the Figliolias, Garcia, and GBD3's refusal to provide an accounting, plaintiffs have been, and continue to incur, damages.

## COUNT 5
### (Violation of 18 U.S.C. §§ 1961-1968 Federal RICO Against Grand Jersey Plaintiffs Against George Figliolia, Louis Figliolia, Jr., and Ortiz)

241.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

242.    George Figliolia, Louis Figliolia, Jr., and Ortiz have acted in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

243.    George Figliolia, Louis Figliolia, Jr., and Ortiz operated as a "business partnership" and enterprise in which they worked together to defraud plaintiffs and steal their money. George Figliolia, Louis Figliolia, Jr., and Ortiz worked together on various projects, operate from the same space, and, upon information and belief, regularly commingle funds.

244.    As described above, George Figliolia, Louis Figliolia, Jr., and Ortiz used deception and altered multiple documents to obtain plaintiffs' investments in Grand Jersey and Sip Avenue with the promise to provide construction and financing for the projects. Their representations were false, and part of their scheme to obtain plaintiffs' money and run up significant unsubstantiated bills to Grand Jersey and Sip Avenue for which they could demand payment.

245.    George Figliolia, Louis Figliolia, Jr., and Ortiz engaged in a deliberate plan to provide documents and substantiate their conduct with lies, to deceive plaintiffs to continue funding the projects so that they could steal plaintiffs' money.

246.    George Figliolia, Louis Figliolia, Jr., and Ortiz used the fraudulent U.S. Bank statement to convince plaintiffs and the JCRA to go into business with them

and then used the fraudulent CGA document to convince plaintiffs to continue their relationship.

247.    George Figliolia, Louis Figliolia, Jr., and Ortiz, acting as an enterprise, are alleged to have used a similar fraudulent scheme in another real estate transaction in Harrison, New Jersey, as described above in paragraph 96. In that matter, it was the Figliolias who allegedly proffered the altered U.S. Bank document to substantiate that they had funds available. With respect to Grand Jersey and Sip Avenue, Ortiz used the altered bank document to give the false appearance that he had access to such funds, all with the assistance of the Figliolias and their employees.

248.    Garcia and Asante supported the enterprise's fraudulent activities.

249.    As a result of George Figliolia, Louis Figliolia, Jr., and Ortiz's conduct, plaintiffs have been, and continue to be, damaged.

## COUNT 6
### (Breach of Contract Against the Figliolias and GBD3)

250.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

251.    The Figliolias and GBD3 breached the Grand Jersey Operating Agreement when they committed the fraudulent and improper conduct described above.

252.    George Figliolia and GBD3's duties and responsibilities involved contributing capital contributions, operating in good faith, interacting with the other members, and devoting such "time to the business and affairs of the Company as is necessary to carry out the Member's duties set forth in this Agreement." Grand Jersey Operating Agreement, § 5.4.1.

253.    Louis Figliolia, Jr.'s duties and responsibilities pursuant to the resolution appointing him manager and the Grand Jersey Operating Agreement involved engaging in the operation of the day-to-day tasks of the company, including managing the finances and entering into agreements to accomplish the purposes of the Company.

254.    The Figliolias and GBD3 failed to comply with their duties and responsibilities in a proper manner, as described above.

255.    The Figliolias and GBD3's misconduct includes making false statements about George Figliolia and GBD3's contributions, misappropriating funds, embezzling money, making false statements about Ortiz's ability to provide the financing, failing to grant the reasonable requests of the other members, ignoring the reasonable requests of the members regarding the running of the company, failing to

provide for a requested accounting, engaging in activities outside of the normal course of company business, and failing to advise the Grand Jersey Plaintiffs of critical information that would impact decision making and the everyday business of the Grand Jersey.

256.   As a result of the Figliolias and GBD3's improper conduct, plaintiffs have been, and continue to be, damaged.

## COUNT 7
### (Breach of Fiduciary Duty Against the Figliolias and GBD3)

257.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

258.    The Figliolias and GBD3 owe a fiduciary duty to the Grand Jersey Plaintiffs. The Figliolias also owe a fiduciary duty to the Sip Avenue Plaintiffs.

259.    The Figliolias and GBD breached their fiduciary duty to the Grand Jersey Plaintiffs and Grand Jersey by engaging in self-dealing, misappropriating Grand Jersey's assets, committing fraud, embezzling funds, concealing records, and freezing the Grand Jersey Plaintiffs out of the company.

260.    The Figliolias also breached their fiduciary duty to the Sip Avenue Plaintiffs by engaging in self-dealing, misappropriating Sip Avenue's assets, committing fraud, embezzling funds, concealing records, and inappropriately using funds from Sip Avenue for other purposes without approval.

261.    As a result of the Figliolias and GBD3's breaches of their fiduciary duties, plaintiffs have been, and continue to suffer, damages.

## COUNT 8
**(Breach of Contract Against Ortiz and the Forthright Entities)**

262.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

263.    Ortiz and the Forthright Entities fraudulently induced Grand Jersey and negotiated with it in bad faith. Ortiz and the Forthright Entities also breached the Grand Jersey Term Sheet via their fraud and deception.

264.    Ortiz and the Forthright Entities' conduct includes falsely representing that Ortiz and the Forthright Entities would be providing funding for the deals, and obtaining payments from Grand Jersey and Sip Avenue by these fraudulent means.

265.    Ortiz and the Forthright Entities were never able to provide the funding for Grand Jersey or Sip Avenue.

266.    As a result of Ortiz and the Forthright Entities' fraudulent conduct, the plaintiffs have been, and continue to suffer, damages.

## COUNT 9
**(Breach of Fiduciary Duty Against Ortiz and the Forthright Entities)**

267.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

268.    Ortiz and the Forthright Entities owed a fiduciary duty to plaintiffs.

269.    Ortiz and the Forthright Entities breached their fiduciary duty to plaintiffs by engaging in fraudulent conduct including fraudulent inducement, falsely representing that Ortiz would be providing funding, and obtaining payments from Grand Jersey and Sip Avenue by these fraudulent means.

270.    As a result of Ortiz and the Forthright Entities' breaches of their fiduciary duties, plaintiffs have been, and continue to suffer, damages.

## COUNT 10
### (Fraudulent Inducement Against All Defendants)

271.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

272.    The Figliolias and Garcia fraudulently induced plaintiffs to contribute capital to Grand Jersey and Sip Avenue by falsely representing that George Figliolia had contributed his own capital. Plaintiffs justifiably relied on the Figliolias and Garcia's material misrepresentations to their detriment by contributing capital and by allowing George Figliolia's companies to continue to manage Grand Jersey and Sip Avenue.

273.    Plaintiffs would not have agreed to allow the Figliolias, their associates, or their companies to provide managerial responsibilities and run Grand Jersey, or be involved with Grand Jersey or Sip Avenue at all had they known of the Figliolias and Garcia's misrepresentations and fraudulent conduct, including, but not limited to, George Figliolia's failure to provide capital contributions for Grand Jersey and Sip Avenue, the false documents purporting to show that he had, and the Figliolia's embezzlement of plaintiffs' contributions.

274.    Ortiz and the Figliolias fraudulently induced plaintiffs to agree to retain and pay Ortiz to provide financing for the Grand Jersey and Sip Avenue transactions by providing false and fraudulent documents that purported to show Ortiz's ability to provide financing, when he had no such ability. Ortiz and the Figliolias made these misrepresentations with the intent that plaintiffs would rely on them and supply more funding for Ortiz and the Figliolias to embezzle.

275.    Plaintiffs would not have agreed to allow Ortiz and the Forthright Entities to provide the financing had they known of Ortiz's misrepresentations and fraudulent conduct, including but not limited to, creating false documents to support the supposed existence of financing and making misrepresentations about conversations with a lender regarding financing and the ability to close.

276.    The other Defendants assisted the Figliolias and Ortiz in their fraudulent conduct.

## <u>COUNT 11</u>
### (Common Law Fraud Against All Defendants)

277.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

278.    Plaintiffs relied upon the Figliolias, their associates, Garcia, and the Figliolia Companies in connection with their management responsibilities for Grand Jersey and Sip Avenue. The Figliolias, their associates, Garcia, and their companies represented that they would equally contribute money to Grand Jersey and Sip Avenue. These representations were false. The Figliolias, their associates, Garcia, and their companies also embezzled funds from Grand Jersey and Sip Avenue and submitted fraudulent invoices claiming payment for purported services without sufficient documentation.

279.    Ortiz, the Ortiz Entities, the Figliolias, the Figliolia Companies, Asante, and Birchcrest Advisors represented that Ortiz could and would deliver financing for the Grand Jersey transaction. These representations were false.

280.    Defendants were aware that their representations were false and inaccurate.

281.    Plaintiffs reasonably relied upon Defendants' misrepresentations.

282.    As a result of Defendants' conduct, plaintiffs have been, and continue to incur, damages.

## COUNT 12
**(Negligent Misrepresentation Against George Figliolia, Louis Figliolia, Jr., Garcia, GBD3, Ortiz, the Ortiz Entities, Asante, and Birchcrest Advisors)**

283.   Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

284.   George Figliolia, Louis Figliolia, Jr., Garcia, and GBD3 made false representations to plaintiffs, including but not limited to, misrepresentations about the Figliolias' contributions to Grand Jersey and Sip Avenue, the finances of both ventures (including payments to the Figliolias and the Figliolia Companies), invoices due, and Ortiz's purported financing for the Grand Jersey transaction, among others.

285.   Ortiz, the Ortiz Entities, Asante, and Birchcrest Advisors made false representations to plaintiffs, including but not limited to, misrepresentations about Ortiz's access to funds and negotiations with a funding source for the Grand Jersey transaction. Ortiz, the Ortiz Entities, Asante, and Birchcrest Advisors made these misrepresentations with the intent that plaintiffs would rely on them.

286.   Plaintiffs justifiably relied on Defendants' material misrepresentations to their detriment.

287.   Plaintiffs would not have continued to transact business with Defendants had they known of the Defendants' misrepresentations and fraud, including, but not limited to, the Figliolias' misrepresentations about their contributions and embezzlement, and Ortiz's use of altered and fake documents to give and maintain the false pretense that he could arrange funding for the Grand Jersey transaction.

71

## <u>COUNT 13</u>

**(Tortious Interference with Contract Against Ortiz, the Ortiz Entities, Asante, and Birchcrest Advisors)**

288.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

289.    Ortiz, the Ortiz Entities, Asante, and Birchcrest Advisors tortiously interfered with the Grand Jersey Operating Agreement between the Grand Jersey Plaintiffs and the other members, and with the PSA and RDA between Grand Jersey and the JCRA, including by making false representations about providing financing and using altered and fake documents to give and maintain the false pretense that Ortiz could arrange funding for the Grand Jersey transaction.

## <u>COUNT 14</u>
### (Tortious Interference with Prospective Economic Advantage Against All Defendants)

290.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

291.    Defendants' fraudulent conduct has tortiously interfered with Plaintiffs' prospective economic advantage.

292.    As described above, Ortiz and the Ortiz Entities made false representations about their ability to procure funding for the Grand Jersey and Sip Avenue projects and about conversations Ortiz supposedly had with a funding source, submitted false documents in support of Ortiz's misrepresentations, and accepted money from plaintiffs based on these false pretenses, all to plaintiffs' detriment. Asante and Birchcrest Advisors assisted Ortiz and the Ortiz Entities' fraud.

293.    As described above, the Figliolias, their associates, and their companies also made misrepresentations about Ortiz and the Ortiz Entities' abilities to provide the funding for Grand Jersey and Sip Avenue projects and assisted them in their fraudulent misrepresentations.

294.    Absent Defendants' improper conduct, it is reasonably probable that plaintiffs would have realized an economic advantage or benefitted from another lender providing the financing to close the Grand Jersey deal and also would have been able to enter into and close the Sip Avenue deal.

295.    As a result of Defendants' improper conduct, plaintiffs have been, and continue to be, damaged.

## COUNT 15
**(Unjust Enrichment Against George Figliolia, Louis Figliolia, Jr., GBD3, Ortiz and the Forthright Entities)**

296.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

297.    As a result of the above-mentioned acts, George Figliolia, Louis Figliolia, Jr., GBD3, Ortiz, and the Forthright Entities have been unjustly enriched, all to the damage and detriment of plaintiffs.

## COUNT 16
### (Quasi-Contract Against all Defendants)

298.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

299.    Defendants paid themselves through funds that the Grand Jersey Plaintiffs contributed to Grand Jersey. Defendants were not entitled to the funds that they embezzled from Grand Jersey.

300.    Defendants paid themselves through funds that Salmieri Sip Avenue and Sip Avenue JC Holdings contributed to Sip Avenue. Defendants were not entitled to any of the funds that they embezzled from Sip Avenue.

301.    Defendants including Ortiz, the Forthright Entities, George Figliolia, Louis Figliolia, Jr., and their associates should not be allowed to enrich themselves at the expense of plaintiffs.

## COUNT 17
**(Promissory Estoppel Against George Figliolia, Louis Figliolia, Jr., and Garcia)**

302.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

303.    The Figliolias promised Salmieri Sip Avenue and Sip Avenue JC Holdings that they would work to purchase the Sip Avenue property, invest their own capital, and then manage the project.

304.    The Figliolias and Garcia falsely misrepresented that the Figliolias contributed capital on par with the Sip Avenue Plaintiffs. They did not.

305.    The Figliolias and Garcia knew that the Sip Avenue transaction would not happen because of Ortiz's use of altered and fake documents to give and maintain the false pretense that he could arrange funding.

306.    The Sip Avenue Plaintiffs lost their capital investments because of George Figliolia, Louis Figliolia, Jr., and Garcia's deceitful promises.

307.    As a result of George Figliolia, Louis Figliolia, Jr., and Garcia's conduct, plaintiffs have been, and continue to be, damaged.

## <u>COUNT 18</u>
### (Promissory Estoppel Against Ortiz)

308.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

309.    Ortiz promised plaintiffs that he would provide the funding for the Grand Jersey and Sip Avenue deals.

310.    Ortiz never had ability to fund either transaction. Instead, Ortiz relied on altered and false documents to give and maintain the false pretense that he had the ability to obtain such funding.

311.    Ortiz knew that plaintiffs would rely on his representations and would not seek other funding sources.

312.    Ortiz promised that he would provide the funding in order to obtain money from plaintiffs.

313.    Plaintiffs reasonably relied upon Ortiz in deciding to contribute capital to Grand Jersey and Sip Avenue.

314.    Based on his fraud, Ortiz was paid, directly and indirectly, by both Grand Jersey and Sip Avenue.

315.    As a result of Ortiz's conduct, plaintiffs have been, and continue to be, damaged.

## <u>COUNT 19</u>
### (Breach of Implied Covenant of Good Faith and Fair Dealing Against George Figliolia and Louis Figliolia, Jr.)

316.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

317.    George Figliolia and Louis Figliolia, Jr. breached the implied covenant of good faith and fair dealing inherent in any New Jersey contractual relationship.

318.    Based on their positions in Grand Jersey, and pursuant to the Grand Jersey Operating Agreement, George Figliolia and Louis Figliolia, Jr. had an obligation to conduct themselves in good faith with respect to business matters.

319.    George Figliolia and Louis Figliolia, Jr. were obligated to conduct fair dealings in business activities, including, but not limited to, providing capital contributions, operating the company legitimately, and not in an *ultra vires* manner.

320.    George Figliolia and Louis Figliolia, Jr. failed to conduct themselves in such a manner, taking advantage of the parties' business relationship to benefit themselves.

321.    As a result of George Figliolia and Louis Figliolia, Jr.'s conduct, plaintiffs have been, and continue to be, damaged.

## <u>COUNT 20</u>
**(Mismanagement Against George Figliolia and Louis Figliolia, Jr.)**

322.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

323.    The above-mentioned actions of George Figliolia and Louis Figliolia, Jr. constitute mismanagement, abuse of authority, and oppressive and unfair conduct related to Grand Jersey, all to the damage of plaintiffs.

## <u>COUNT 21</u>
**(Conversion Against George Figliolia, Louis Figliolia, Jr.,
and the Figliolia Companies)**

324.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

325.    The Figliolias unlawfully paid themselves and the Figliolia Companies with Grand Jersey and Sip Avenue funds.

326.    The Figliolias took money that they were not entitled to and diverted it to themselves, their associates, the Figliolia Companies, and others, wrongfully converting plaintiffs' assets for their own benefit.

327.    As a result of this wrongful conduct, plaintiffs have been, and continue to be, damaged.

## COUNT 22
### (Waste Against George Figliolia and Louis Figliolia, Jr.)

328.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

329.    George Figliolia and Louis Figliolia, Jr. committed waste when they embezzled funds from plaintiffs and operated Grand Jersey outside the normal course of business, including by failing to make George Figliolia's capital contributions and committed waste when they embezzled funds from plaintiffs, including by embezzling money.

330.    As a result of George Figliolia and Louis Figliolia, Jr.'s conduct, plaintiffs have been, and continue to be, damaged.

## COUNT 23
### (Waste Against Ortiz)

331.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

332.    Ortiz committed waste when he deceived the Grand Jersey plaintiffs into entering into an agreement with him which interfered with the normal course of business and function of Grand Jersey, including by lying to plaintiffs about being able to finance the project.

333.    As a result of Ortiz's conduct, plaintiffs have been, and continue to be, damaged.

## COUNT 24
**(Conspiracy Against George Figliolia, Louis Figliolia, Jr., and Ortiz)**

334.    Plaintiffs repeat the allegations in paragraphs 1 through 216 here.

335.    George Figliolia, Louis Figliolia, Jr., and Ortiz agreed to work together to fraudulently obtain funds from plaintiffs, so that they could then divert the funds to themselves.

336.    George Figliolia, Louis Figliolia, Jr., and Ortiz intended to deceive plaintiffs so that plaintiffs would contribute capital to the Grand Jersey and Sip Avenue projects.

337.    George Figliolia, Louis Figliolia, Jr., and Ortiz engaged in a deliberate plan to provide altered and false documents and make false representations to convince plaintiffs to continue to fund the projects. George Figliolia, Louis Figliolia, Jr., and Ortiz then executed their scheme. In reliance on the deceit of George Figliolia, Louis Figliolia, Jr., and Garcia, plaintiffs contributed money to the projects.

338.    George Figliolia, Louis Figliolia, Jr., and Ortiz's scheme was to steal plaintiffs' money.

339.    As a result of George Figliolia, Louis Figliolia, Jr., and Ortiz's conduct, plaintiffs have been, and continue to be, damaged.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs respectfully request:

1.    That the Court enter judgment that:

    a.    Defendants George Figliolia, Louis Figliolia, Jr., and GBD3 have violated the Revised Uniform Limited Liability Company Act, N.J.S.A. § 42:2C-1 *et seq.*, including, N.J.S.A. § 42:2C-39;

    b.    Defendants George Figliolia, Louis Figliolia, Jr., and Ortiz violated 18 U.S.C. §§ 1961-1968; and

    c.    The Defendants identified for each count engaged in the conduct identified in that cause of action in violation of New Jersey common law.

2.    That the Court enter an order:

    a.    Requiring that George Figliolia and GBD3 are dissociated from Grand Jersey pursuant to N.J.S.A. § 42:2C-46(e);

    b.    Requiring that George Figliolia and GBD3's 49% ownership interest in Grand Jersey be extinguished pursuant to N.J.S.A. N.J.S.A. § 42:2C-47(c) and transferred to the Grand Jersey Plaintiffs at no cost;

    c.    Alternatively, dissolving Grand Jersey pursuant to N.J.S.A. §§ 42:2C-48(a)(4) - (5);

    d.    Requiring George Figliolia, Louis Filgiolia, Jr., Garcia, and GBD3 provide for an accounting of the books and records of Grand Jersey and Sip Avenue by an independent auditor;

    e.    Removing Louis Figliolia, Jr. from managing Grand Jersey;

    f.    Awarding counsel fees to plaintiffs pursuant to N.J.S.A. § 42:2C-48(a)(6)(c) as a result of the bad faith conduct of George Figliolia and GBD3;

    g.    Declaring that Grand Jersey shall not indemnify George Figliolia, Louis Figliolia, Jr., or GBD3 for any of their conduct and that they

are liable for the liabilities that the company has incurred in light of their fraudulent conduct;

h.      Requiring that George Figliolia and Louis Figliolia, Jr. do not take any further actions on behalf of Sip Avenue;

i.      Setting aside the Grand Jersey Term Sheet and any other agreements with Ortiz on the basis of fraudulent inducement;

j.      Requiring the return of all monies obtained from plaintiffs, including, but not limited to:

     i.      All funds George Figliolia, Louis Figliolia, Jr., Garcia, GBD3, Ortiz, the Ortiz Entities, Asante, and Birchcrest Advisors embezzled from plaintiffs;

     ii.      The $600,000 deposit that Grand Jersey paid the JCRA, as well as the $100,000 extension deposit; and

     iii.      All moneys Ortiz and the Forthright Entities received, directly or indirectly, from Grand Jersey and Sip Avenue, including the return of all moneys that was paid to any other entity or person on behalf of Ortiz;

k.      Imposing a constructive trust on the assets of George Figliolia and his companies, including G Builders, GBD3, GBD5, BGD, DNG, and DNG1;

l.      Freezing the assets of George Figliolia and his companies, including G Builders, GBD3, GBD5, BGD, DNG, and DNG1;

m.      Imposing a constructive trust on the Figliolia Family Dynasty Trust;

n.      Piercing the corporate form of the Figliolia Companies and the Figliolia Family Dynasty Trust;

o.      Freezing the assets of Ortiz and the Forthright Entities;

p.      For the RICO claim, awarding plaintiffs treble damages including compensatory, consequential, and punitive damages in amounts to be determined at trial;

q.      For all other claims, awarding plaintiffs compensatory, consequential, and punitive damages in amounts to be determined at trial;

r.  Awarding plaintiffs costs, expenses, and attorneys' fees incurred; and

s.  Any other and further relief as the Court deems just and proper.

Dated: February 14, 2025                    Respectfully submitted,

*/s/ Lee M. Cortes, Jr.*
Lee M. Cortes, Jr. (ID# 04199-2009)
Arnold & Porter Kaye Scholer LLP
One Gateway Center, Suite 1025
Newark, NJ 07102
Telephone: (973) 776-1853
Email: Lee.Cortes@arnoldporter.com

Rebecca Zoller (*pro hac vice forthcoming*)
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-7491

*Counsel for Plaintiffs Salmieri Grand Jersey, LLC and Fields Grand Ave JC LLC, in their individual capacity and derivatively on behalf of Grand Jersey Group, LLC, Salmieri Sip Avenue, and Sip Avenue JC Holdings LLC*

**CERTIFICATION UNDER LOCAL CIVIL RULE 11.2**

In accordance with 28 U.S.C. § 1746, I hereby certify, under penalty of perjury under the laws of the United States, that the matter in controversy in this Verified Complaint is not the subject of any other action pending in any court, or any pending arbitration or administrative proceeding.

Respectfully submitted,

*/s/ Lee M. Cortes, Jr.*
Lee M. Cortes, Jr. (ID# 04199-2009)
Arnold & Porter Kaye Scholer LLP
One Gateway Center, Suite 1025
Newark, NJ 07102
Telephone: (973) 776-1853
Email: Lee.Cortes@arnoldporter.com

*Counsel for Plaintiffs Salmieri Grand Jersey, LLC and Fields Grand Ave JC LLC, in their individual capacity and derivatively on behalf of Grand Jersey Group, LLC, Salmieri Sip Avenue, and Sip Avenue JC Holdings LLC*

87

**VERIFICATION**

I, Salvatore Salmieri, Sr., being duly sworn, deposes and says:

I have read the appended Verified Complaint and know its contents to be true of my personal knowledge, except where the allegations as set forth are on information and belief or where the information was related to me by others, which allegations have been included here based upon the surrounding facts and circumstances I believe to be true.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on February 14, 2025

_____
Salvatore Salmieri, Sr.

## VERIFICATION

I, Scott Fields, being duly sworn, deposes and says:

I have read the appended Verified Complaint and know its contents to be true of my personal knowledge, except where the allegations as set forth are on information and belief or where the information was related to me by others, which allegations have been included here based upon the surrounding facts and circumstances I believe to be true.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on February 14, 2025

_____

Scott Fields

## List of Exhibits

| Exhibit Letter | Document Name | Approximate Date |
|---|---|---|
| A | Certificate of Formation for Grand Jersey Group LLC | March 30, 2023 |
| B | Second Amended and Restated Operating Agreement of Grand Jersey Group, LLC | March 30, 2024 |
| C | Grand Jersey Executed Application and Certification for JCRA | April 21, 2023 |
| D | Grand Jersey Application and Certification for JCRA | January 12, 2024 |
| E | Resolution/Authorization of the Members of Grand Jersey Group LLC, a New Jersey Limited Liability Company | January 25, 2024 |
| F | Certificate of Formation for Sip Avenue JV LLC | May 2, 2023 |
| G1 | Letter from Jose Ortiz (TZZ Investment Group, LLC) to Diana Jeffrey, JCRA | February 10, 2023 |
| G2 | Letter from Corey Reavis, U.S. Bank Institutional Trust & Custody to TZZ Investment Group, LLC (listing Jose Ortiz as sole signatory) (submitted copy attached to Ortiz's Letter) | January 27, 2023 |
| H | Letter from Corey Reavis, U.S. Bank Institutional Trust & Custody to TZZ Investment Group, LLC (listing Thiago Franzese and Jose Ortiz as the sole signatories) (real copy) | January 27, 2023 |
| I | Purchase and Sale Agreement between JCRA and Grand Jersey Group LLC (Execution Copy) | January 25, 2024 |
| J | Redevelopment Agreement between Jersey City Redevelopment Agency (as redevelopment entity) and Grand Jersey Group LLC (Execution Copy) | January 25, 2024 |
| K | Term Sheet sent to Louis Figliolia for proposed financing from Forthright Holdings, LLC | March 15, 2024 |
| L | CGA Capital Document | September 1, 2024 |
| M | Email from George J. Figliolia, subject line: "Fwd: Jersey City" | September 12, 2024 |
| N | Letter from Joseph P. Baumann, Jr. (MS&B) to Anthony Pantano | October 24, 2024 |

| Exhibit Letter | Document Name | Approximate Date |
|---|---|---|
| O | Letter from Louis Figliolia (Grand Jersey Group LLC) to Jersey City Redevelopment Authority (JCRA) c/o McManimon, Scotland & Baumann, LLC (attention: Joseph P. Baumann, Jr.) | October 25, 2024 |